**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1877**

T.B., JR., by and through his Parents, T.B., SR. and F.B.,

   Plaintiff - Appellant,

v.

PRINCE GEORGE'S COUNTY BOARD OF EDUCATION; PRINCE
GEORGE'S COUNTY PUBLIC SCHOOLS; DR. KEVIN M. MAXWELL, in his
official capacity as Chief Executive Officer of Prince George's County Public
Schools,

   Defendants - Appellees.

------------------------------

COUNCIL OF PARENT ATTORNEYS AND ADVOCATES; DISABILITY
RIGHTS MARYLAND,

   Amici Supporting Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
George Jarrod Hazel, District Judge.  (8:15-cv-03935-GJH)

Argued:  March 20, 2018          Decided:  July 26, 2018

Before GREGORY, Chief Judge, and WILKINSON and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Agee
joined. Chief Judge Gregory wrote an opinion concurring in the judgment only.

**ARGUED:** Dennis Craig McAndrews, MCANDREWS LAW OFFICES, Berwyn, Pennsylvania, for Appellant. Andrew Wayne Nussbaum, NUSSBAUM LAW, LLC, Clarksville, Maryland, for Appellees. **ON BRIEF:** Anastasia L. McCusker, Joel I. Sher, SHAPIRO SHER GUINOT & SANDLER, Baltimore, Maryland; Michael E. Gehring, MCANDREWS LAW OFFICES, Berwyn, Pennsylvania, for Appellant. Selene Almazan-Altobelli, Catherine Merino Reisman, COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC., Towson, Maryland, for Amici Curiae.

WILKINSON, Circuit Judge:

T.B., a former student of Prince George's County Public Schools (PGCPS), alleges that the school district failed to provide him a free appropriate public education in violation of the Individuals with Disabilities Education Act (IDEA). While we agree with the administrative law judge and district court that the school district committed a procedural violation of the IDEA, we also agree with them, that on these facts, the violation did not actually deprive T.B. of a free appropriate public education. We thus affirm the district court's grant of summary judgment to PGCPS.

## I.

T.B. began attending PGCPS schools in elementary school. As an elementary schooler, he received mostly As and Bs, although his performance in reading and math was below grade level. T.B.'s grades took a turn for the worse in middle school. In seventh grade, he received two Cs and four Ds. The following year, he received five Cs, two Ds, and one failing grade (E). His middle school teachers noted that T.B. did "not follow instructions," did "not participate in class," had "[m]issing/incomplete assignments," and received "[p]oor test/quiz grades." J.A. 1900, 1904.

Things did not improve when T.B. began at Friendly High School in 2012. T.B.'s grades, for the most part, continued to decline. He finished ninth grade with two Ds and four Es. He did, however, receive an A in Personal Fitness and a B in Naval Science. In tenth grade, T.B. failed every class except Algebra, in which he received a B. T.B. accordingly failed the tenth grade as a whole and was not able to advance to eleventh grade.

3

These declining grades reflected, in part, T.B.'s declining attendance. In his two years at Friendly, T.B. recorded a total of 68.5 days of absence. More than 90% of these absences were unexcused. Near the end of T.B.'s tenth grade year, he stopped attending school entirely. On the days that T.B. did attend school, he regularly skipped class or was tardy. In class, T.B. was often disruptive. He would ignore instructions, use his cell phone, and talk to other students during class time. Even in classes he went on to fail, though, T.B. generally performed adequately when he attended class and completed assignments.

T.B.'s academic issues during this time did not go unnoticed. In October 2012, shortly after T.B. started ninth grade, T.B.'s father emailed the guidance counselor at Friendly to request that T.B. be tested for a disability or provided special education services. PGCPS held an Individualized Education Program (IEP) meeting the following month. The IEP team concluded that T.B.'s difficulties were not the result of any learning or other disability. It therefore determined further assessment to be unnecessary, and scheduled a parent-teacher conference for the following January. At the conference, T.B. and his parents met with his teachers and other PGCPS staff to discuss his academic progress and strategies to get him back on track.

When T.B.'s academic performance did not improve, T.B.'s parents continued to request testing or special education services. Because the school district maintained that no testing was necessary, T.B.'s parents retained Basics Group Practice, LLC, to perform an Independent Educational Evaluation (IEE). Basics tested T.B. in May 2014 and diagnosed him with moderate Attention Deficit Hyperactivity Disorder (ADHD), Specific

Learning Disorder with impairment in written expression, and unspecified depressive disorder. T.B.'s father provided the Basics report to PGCPS shortly after receiving it in August 2014.

T.B. transferred from Friendly to Central High School for his second year in tenth grade. T.B.'s career at Central, however, was short-lived. He attended the school for only the first few days of the fall semester before halting his attendance altogether. His parents offered various explanations, among them noise in the school, asthma, and panic attacks.

Finding the school district insufficiently responsive to their requests for special education, T.B.'s parents filed a Due Process Complaint with the Maryland Office of Administrative Hearings on January 13, 2015. The complaint alleged that T.B. had been denied a free appropriate public education and requested both compensatory education and reimbursement for the Basics IEE.

While proceedings based on that complaint were ongoing, T.B.'s family and PGCPS continued to negotiate appropriate education for T.B. At a January 26, 2015, IEP meeting, T.B.'s parents explained that T.B.'s anxiety had prevented him from attending school in the fall. Following that meeting, the IEP team determined that T.B. should receive additional testing to determine his eligibility for special education.

A PGCPS school psychologist conducted the testing and concluded in late February that T.B. had severe problems with anxiety and was eligible for special education. Following this recommendation, an IEP team concluded in March that T.B. was eligible for special education services on the basis of an emotional disability— namely, anxiety that prevented him from regularly attending school. The team also

5

agreed to offer T.B.'s parents five fee-waived credit recovery courses as compensatory services. In April 2015, following additional IEP meetings, an IEP team recommended a specialized program at Dr. Henry A. Wise, Jr. High School. T.B. never attended the Wise program.

Meanwhile, T.B.'s Due Process Complaint progressed. The matter was assigned to a Maryland administrative law judge (ALJ), who conducted a 6-day hearing that involved 21 witnesses and 95 exhibits. The ALJ ultimately found that PGCPS had committed a procedural violation of the IDEA in failing to conduct testing in response to T.B.'s parents' requests, but that this violation "did not actually interfere with the provision of a free appropriate public education." J.A. 31 (quoting *DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester Cty.*, 309 F.3d 184, 190 (4th Cir. 2002)). Specifically, the ALJ concluded that "no evidence supports the view that, had testing been promptly provided, the Student would have regularly attended school." J.A. 31. Instead, T.B. "simply [did] not want to go to school. This is the case regardless of the school, the teachers, the courses, the programs, the placement, the accommodations, the class size, or the compensatory services offered." J.A. 31. The ALJ therefore found that T.B. was "not entitled to compensatory education at public expense." J.A. 52. The ALJ also found that T.B. was not entitled to reimbursement for the Basics IEE.

T.B.'s parents filed a complaint in district court under 20 U.S.C. § 1415(i)(2) seeking reversal of the ALJ's decision, an award of compensatory education, and reimbursement for the Basics IEE. While T.B. ultimately prevailed on the IEE reimbursement question, the district court otherwise affirmed the ALJ's decision and

granted summary judgment to the school district. It agreed that the "finding that T.B. would not have attended school even if he had been tested" supported the "conclusion that the procedural failure to respond to [T.B.'s parents'] request for an evaluation did not actually interfere with the provision of" a free appropriate public education. J.A. 168. The district court accordingly affirmed the ALJ's denial of compensatory education. T.B. now appeals to this court.[1]

## II.

### A.

The IDEA was enacted "to throw open the doors of public education and heed the needs" of students with disabilities who had for too long been "either completely ignored or improperly serviced by American public schools." *In re Conklin*, 946 F.2d 306, 307 (4th Cir. 1991).[2] It operates by way of a simple exchange: the federal government provides funding to the states, who must in return have "in effect policies and procedures to ensure" that every child with a disability has the opportunity to receive a "free appropriate public education" (FAPE). 20 U.S.C. § 1412(a).

---

[1] The ALJ and district court also both addressed the statute of limitations in this case. Because no party has appealed the district court's decision on that issue, we do not consider the statute of limitations arguments made by amici.

[2] Early cases refer to the Act by its original title: the "Education of the Handicapped Act." Its title was changed to the "Individuals with Disabilities Education Act" in 1990. Education of the Handicapped Act Amendments of 1990, Pub. L. No. 101-476, § 901(a)(1), 104 Stat. 1103, 1141-42 (codified as amended at 20 U.S.C. § 1400(a)). For simplicity, we refer to the Act by its contemporary title throughout.

Under the IDEA, a FAPE is defined to include "special education and related services" that are provided "without charge" to the child's family and that "meet the standards of the State educational agency." *Id.* § 1401(9). A FAPE will also involve an "individualized education program" (IEP) for each eligible child. *Id.* The Supreme Court has described the IEP as "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). It must include "a statement of the child's present levels of academic achievement and functional performance," "a statement of measurable annual goals," and "a statement of the special education and related services and supplementary aids and services . . . to be provided to the child." 20 U.S.C. § 1414(d)(1)(A)(i). To meet the IDEA's "substantive obligation," the school must offer an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).

In addition to providing an IEP for all students known to have disabilities, states receiving IDEA funding have an ongoing obligation to ensure that "[a]ll children with disabilities . . . who are in need of special education and related services[] are identified, located, and evaluated." 20 U.S.C. § 1412(a)(3)(A). This obligation, known as Child Find, extends to all "[c]hildren who are suspected of being a child with a disability . . . and in need of special education." 34 C.F.R. § 300.111(c). Failure to meet this obligation "may constitute a procedural violation of the IDEA." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012). But such a procedural violation "will be 'actionable' only 'if [it] affected the student's substantive rights.'" *Leggett v. District of Columbia*, 793

8

F.3d 59, 67 (D.C. Cir. 2015) (quoting *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 832, 834 (D.C. Cir. 2006)).

B.

The IDEA rightly "recogni[zes] that federal courts cannot run local schools." *Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997). Complaints under the IDEA thus do not begin their journey in the federal courts. Instead, parents who disagree with a school district's educational plan for their child first have the opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child," as well as an "opportunity for mediation" with the school district. 20 U.S.C. § 1415(b). If the parents remain unsatisfied, they are entitled to "an impartial due process hearing, which shall be conducted by the State [or local] educational agency." *Id.* § 1415(f)(1)(A).

In light of the IDEA's manifest preference for local control of schools, we apply a "modified de novo review" to a state ALJ's decision in an IDEA case, "giving due weight to the underlying administrative proceedings." *M.L. by Leiman v. Smith*, 867 F.3d 487, 493 (4th Cir. 2017) (quoting *O.S. v. Fairfax Cty. Sch. Bd.*, 804 F.3d 354, 360 (4th Cir. 2015)). We determine independently whether the school district violated the IDEA but consider the ALJ's factual findings to be "prima facie correct." *O.S.*, 804 F.3d at 360 (quoting *Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 517 (4th Cir. 2014)).

Performed correctly, this sort of review ensures that courts do not "substitute their own notions of sound educational policy for those of the school authorities which they

9

review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). Indeed, ALJs within state and local educational agencies are themselves expected to "give appropriate deference to the decisions of professional educators." *M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 533 (4th Cir. 2002). The IDEA thus serves to set standards for the education of children with disabilities without displacing the traditional notion that primary responsibility for education belongs to state and local school boards, educators, parents, and students themselves.

III.

We first consider whether PGCPS violated the IDEA in this case. Both the ALJ and district court concluded that PGCPS committed a procedural IDEA violation, and we agree. While our concurring friend suggests that the ALJ and majority place all the blame in this case on T.B. and his parents and absolve PGCPS of all responsibility, Concurring Op. at 28, that is simply incorrect.

The ALJ ultimately concluded that PGCPS had violated the IDEA by "failing to respond to the Parents' requests and conduct a timely evaluation" of whether T.B. was eligible for special education or related services. J.A. 31. The ALJ found that T.B.'s parents had made and PGCPS had ignored "repeated requests for evaluation" throughout T.B.'s ninth- and tenth-grade years. J.A. 30. Indeed, in October of T.B.'s ninth grade year, his father wrote an e-mail to a PGCPS guidance counselor with the subject line: "Having my son get tested." J.A. 1899. E-mails to teachers also demonstrated that T.B.'s father wanted him to get tested, noting that he was "willing to take it as far as [he] can to

10

get [T.B.] the help he need[s]." J.A. 1864. As the ALJ concluded, "[n]ot all of the requests . . . were clear, articulate requests for testing, but some were." J.A. 30.

Both the IDEA itself and the implementing Maryland laws permit parents to refer their children for a special education assessment. *See* 20 U.S.C. § 1414(a)(1)(B); Md. Code Regs. 13A.05.01.04(A)(2)(a). When such a referral is made, these state and federal laws dictate that certain procedures must be followed. In this case, the school district provided no testing in response to T.B.'s parents' requests for an evaluation until after they had filed a formal complaint. The school district declined to test even after T.B.'s parents supplied it with the results of the Basics IEE, which diagnosed T.B. with qualifying disabilities. As the ALJ found, "the failure of PGCPS to timely respond to the Parents' requests for evaluation is inexcusable." J.A. 31.

This is not to say, however, that T.B. was neglected throughout his time at PGCPS. The ALJ found that, on multiple occasions, T.B.'s teachers had been in touch with his parents regarding his academic shortcomings, but that such attempts at a dialogue were often rebuffed. Ms. Eller, T.B.'s tenth-grade English teacher, testified that she had "made contact with" T.B.'s parents and "had also requested a face-to-face meeting." J.A. 1142. But that meeting never happened. Ms. Deskin, T.B.'s tenth-grade Art teacher, testified that she wrote T.B.'s father to "inform him that this student was in danger of failing that quarter." J.A. 1117. But she received no response. Ms. Wilkinson, T.B.'s ninth-grade English teacher, testified that she "sent letters home by [T.B.] for his parents regarding his work." J.A. 1084. But instead of responding to her concerns, T.B.'s parents accused her of "picking on him." *Id.*

11

Individual educators in this case attempted to promote T.B.'s academic progress. But the ALJ's finding that the school district as a whole failed to timely respond to T.B.'s parents' requests for an evaluation is based on a 6-day hearing and extensive evidence. We, like the district court, see no reason to disturb it.

IV.

The fact of a procedural IDEA violation does not necessarily entitle T.B. to relief, however. To obtain the compensatory education he seeks, T.B. must show that this defect in the process envisioned by the IDEA had an adverse effect on his education.

A.

A procedural violation of the IDEA may not serve as the basis for recovery unless it "resulted in the loss of an educational opportunity for the disabled child." *M.M.*, 303 F.3d at 533. A "'mere technical contravention of the IDEA'" that did not "actually interfere with the provision of a FAPE" is not enough. *DiBuo*, 309 F.3d at 190 (quoting *M.M.*, 303 F.3d at 533). Rather, the procedural violation must have caused substantive harm. Specifically, the prospect of recovery for a procedural violation of the IDEA depends on whether the student's disability resulted in the loss of a FAPE.

Thus, this court has held procedural violations to be harmless where the student nonetheless received an IEP and achieved reasonable educational progress. *See Burke Cty. Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir. 1990) (concluding that a student was not entitled to compensatory education where "the procedural faults committed by the [school district] . . . did not cause [the student] to lose any educational opportunity"); *Tice v. Botetourt Cty. Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir. 1990) (denying

12

reimbursement for special education services where there was no allegation that "violations of the evaluation time limits had any detrimental effect on the substance of th[e] IEP"). We have also found that a school district's failure to properly finalize a student's IEP was harmless because the parents had refused to cooperate with the school and the student suffered no educational harm. *M.M.*, 303 F.3d at 535 (agreeing with the district court that "it would be improper to hold [the] School District liable for the procedural violation of failing to have the IEP completed and signed, when that failure was the result of [the parents'] lack of cooperation" (alterations in original)). We have also explained that "refusal to consider . . . private evaluations" of a student is a harmless procedural violation if the student was not actually entitled to additional services. *DiBuo*, 309 F.3d at 191.

Other courts have taken a similar approach to causation and harmlessness. *See, e.g.*, *Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 384 (5th Cir. 2007) (declining to address potential procedural violations after concluding that the student was ineligible for special education services in any event); *Lesesne*, 447 F.3d at 834 ("[A]n IDEA claim is viable only if th[e] procedural violations affected the student's *substantive* rights."); *C.M. v. Bd. of Educ. of Union Cty. Reg'l High Sch. Dist.*, 128 F. App'x 876, 881-82 (3d Cir. 2005) (per curiam); *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 625 (6th Cir. 1990), *superseded by regulation on other grounds*, 34 C.F.R. § 300.116; *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994-95 (1st Cir. 1990).

Of course, the question of causation is not always an easy one. The premise of the IDEA is that struggling students sometimes owe their difficulties to a disability that

special education services could remedy. But not always. Not every student who falters academically owes his difficulties to a disability. Academic challenges may reflect "personal losses," "family stressors," or "unwilling[ness] to accept responsibility" on the part of the student. *D.G. v. Flour Bluff Indep. Sch. Dist.*, 481 F. App'x 887, 892 (5th Cir. 2012) (per curiam). They might simply reflect that a child is "going through a difficult time in her life." *J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 663 (S.D.N.Y. 2011). Therefore, schools are not required "to designate every child who is having any academic difficulties as a special education student." *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 225 (D. Conn. 2008), *aff'd*, 370 F. App'x 202 (2d Cir. 2010).

These alternative explanations for academic difficulties make it imperative to identify those students whom "special education and related services" would assist and those whom they would not. Because academic struggles may arise from such a vast array of circumstances, determining whether intervention would help a student achieve a FAPE, and what type and degree of intervention would do so, is necessarily a "fact-intensive exercise." *Endrew F.*, 137 S. Ct. at 999.

It is axiomatic in this sort of inquiry that deference is due to the trier of fact. *See Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991) ("[F]indings of fact by the hearing officers in cases such as these are entitled to be considered *prima facie* correct."). Faced with thorny counterfactuals, it is the duty of the fact-finder to carefully weigh the evidence to discern whether a procedural violation has in fact adversely affected a student's education. Giving due deference to such determinations recognizes

14

that "the primary responsibility for developing IEPs belongs to state and local agencies in cooperation with the parents, not the courts." *Spielberg v. Henrico Cty. Pub. Sch.*, 853 F.2d 256, 258 (4th Cir. 1988). It also recognizes that ALJs are typically "in a far superior position to evaluate . . . witness testimony" than are reviewing courts. *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 329 n.9 (4th Cir. 2004). Such evaluations almost inevitably rely on "various cues that . . . are lost on an appellate court later sifting through a paper record." *Cooper v. Harris*, 137 S. Ct. 1455, 1474 (2017). This is in part why, throughout the federal system, "deference to the original finder of fact" is "the rule, not the exception." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574-75 (1985).

All of this, of course, assumes that the trier of fact did a conscientious job with the case. And as shown below, the ALJ's review here was anything but cursory. Indeed, he went out of his way to exhaustively determine whether there was any scenario in which special education would have been of any assistance to T.B. within the ambit of the IDEA.

### B.

The ALJ in this case concluded that "PGCPS['s] failure to promptly schedule testing in this case did not establish a failure to provide [a] FAPE" and that therefore T.B. could not recover under the IDEA. J.A. 31. The ALJ described his reasoning as "simple": "the entirety of the record before me establishes that the Student simply does not want to go to school. This is the case regardless of the school, the teachers, the courses, the programs, the placement, the accommodations, the class size, or the compensatory services offered." *Id.* In other words, no type or amount of special education services

15

would have helped T.B. achieve a FAPE. This conclusion was reached following a 6-day, 21-witness, 95-exhibit hearing, and represents the culmination of 67 specific factual findings.

After reviewing the extensive record in this case, the ALJ found "no evidence support[ing] the view that, had testing been promptly provided, the Student would have regularly attended school." *Id.* All of the testimony—that marshalled by the defendant and that marshalled by the plaintiff—pointed to one thing: that T.B.'s problems were rooted in his refusal to go to class or attend school.

This view was vindicated when T.B. failed even to attend the transition program at Wise recommended by his IEP team. That program "is a self-contained program within the Wise building for students with emotional disabilities." J.A. 21. Classes "typically have 8-12 students" and are capped at 12 students. *Id.* The ALJ found that this program "would provide the Student with a FAPE." J.A. 22. At the meeting where this program was recommended, T.B.'s parents participated and "were provided with all required procedural safeguards and documentation." J.A. 21. T.B. was, albeit belatedly, offered the academic services he sought, yet he chose not to take advantage of them. T.B. "has never attended the Transition Program at Wise," and his parents "have never told PGCPS why" this is the case. *Id.* As the ALJ reasoned, all this therefore "tends to corroborate the view that either the Student, or his Parents, or both, are not interested in the Student receiving academic services from PGCPS." J.A. 49.

It was apparent that T.B. had in the past gotten—and was capable of again earning—decent grades if he applied himself. For example, at the January 2013 parent-

16

teacher conference, T.B.'s teachers explained that T.B. did well enough on his completed assignments, but that the real difficulty was getting him to turn in the assignments. When asked why he was not doing his assignments, T.B. "just said he wasn't trying." J.A. 968-69.

T.B.'s widely variable grades, even within single courses, also reflect that he often failed to perform in settings where he was capable of performing well. The fluctuation is remarkable: In ninth-grade U.S. History, T.B. received a grade of 43 in the first quarter but 74 in the third quarter. J.A. 1873. In his ninth-grade Integrating the Sciences course, he received a high of 81 in the first quarter and a low of 45 in the fourth quarter. *Id.* Variation over the course of T.B.'s tenth-grade year was even more extreme: T.B.'s first quarter English grades were 83 and 79, slipping to 17 and 29 by third quarter, and all the way to 0 and 0 by fourth quarter. J.A. 1834.

Consistent with this evidence, "[v]irtually every teacher . . . testified that the Student was capable of performing satisfactory work but that his frequent absences and failure to do assignments necessarily led to poor or failing grades." J.A. 36. Indeed, the teachers' testimony speaks for itself:

- T.B.'s guidance counselor testified that when T.B. "chose to work, he could perform. When he chose not to work, he didn't perform." J.A. 1312.

- T.B.'s tenth-grade Foundations of Technology teacher testified that T.B. "was capable of doing the work required of him" and, in fact, "did well on a number of tests." J.A. 38. The problem was that T.B. "simply didn't do homework and showed little effort or motivation." *Id.*

17

- T.B.'s ninth-grade English teacher testified that when T.B. "wanted to do work, his work was satisfactory." *Id.* She also testified that he "failed every quarter because he simply did not do the work." *Id.*

- T.B.'s tenth-grade Spanish teacher testified that a student cannot pass his class "if he doesn't do homework, has irregular attendance, doesn't pay attention in class, and/or does not show any motivation or desire to learn." J.A. 37.

- T.B.'s tenth-grade Art teacher testified that T.B. "was capable" and that "the work [he] did turn in was satisfactory." J.A. 38-39, 1123. She also testified that "she gave [T.B.] an opportunity to turn in work late when he was absent, but that he never did so." J.A. 39.

- T.B.'s tenth-grade English teacher testified that T.B. "was capable of doing the work required of the course" but that he "made little or no effort" and was "absent . . . a total of 46 times and was also tardy on numerous occasions." *Id.*

These teachers were intimately familiar with T.B. and his work product. They had interacted with him in class, observed his work habits, and evaluated the assignments he submitted. Yet they almost universally testified that "there was no reason to suspect that the Student suffered from a learning disability or any other condition mandating special education services." J.A. 36-37. This is true of not only the teachers the school district called but also the teachers T.B. called. Most, if not all, of the teachers who testified had recommended other students for special education evaluation in other cases. But in T.B.'s case, their professional judgment and experience led them to the opposite conclusion. Like the ALJ, this court is rightfully "reluctant to second-guess" the educational

18

decisions of professionals with first-hand experience not only with the student in this case, but with a wide variety of other students. *M.M.*, 303 F.3d at 532; *see also Cty. Sch. Bd. of Henrico Cty. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 307 (4th Cir. 2005) ("[A]t all levels of an IDEA proceeding, the opinions of the professional educators are entitled to respect.").

The educational professionals who interacted with T.B. were nearly unanimous in their conclusion: T.B. had no disability that special education would have remedied; he was simply unwilling to take his education seriously. And routinely, this disinterest manifested itself in outright contempt. T.B.'s teachers reported that he would talk, text, play cell phone games, and otherwise cause disruptions during class. Ms. Eller testified that T.B. "need[ed] to be told multiple times per day to do his work and to stop talking with other students" and "routinely ha[d] to be told to put his phone away." J.A. 1136. Ms. Wilkinson testified that T.B. simply "wouldn't follow the rules." J.A. 1090. These behaviors detracted not only from his own education but also from the education of his classmates, and required frequent intervention from teachers. When not actively disruptive, T.B. would occasionally sleep through class. J.A. 1336.

Perhaps most tellingly, his disdain for schooling at times ventured into pure meanness: T.B. ridiculed his tenth-grade English teacher, who was a transgender woman. He would refer to her as "Mr.," "sir," "he," and "him," even after she pleaded with him to respect her gender preference. J.A. 1139.

In contrast to the consistent refrain from T.B.'s teachers that his academic challenges stemmed from his lack of effort, the contrary testimony T.B.'s father offered

19

"was frequently shifting or contradicted by other testimony and documentary evidence." J.A. 41. The ALJ therefore discounted his testimony as "unreliable." *Id.* This type of credibility determination by the fact-finder is the type of conclusion to which we afford the greatest deference, and it is amply supported by the record here.

The ALJ found much of the plaintiff's other evidence similarly inconsistent or incredible. The Basics report was unpersuasive because "the qualifications and training (and, indeed, the identi[t]y) of the person administering the test [were] uncertain," because "the author or authors of the report were not present to testify and therefore were not subject to cross-examination," and because the "Basics documents contradict each other" with respect to T.B.'s diagnosis. J.A. 42, 47. Finally, the ALJ noted that the authors of the Basics report "had no contact with any of [T.B.'s] teachers or other PGCPS educators." J.A. 43.

The plaintiff's expert opinions, too, were "in a jumble." J.A. 47. In contrast to T.B.'s teachers, each expert had very limited contact with T.B., and they offered differing diagnoses. One expert concluded that "T.B. suffers from situational depression and anxiety" rather than a learning disability. J.A. 47-48. Another "adopt[ed] the views of the Basics author" without making clear which of the contradictory Basics documents she agreed with. *Id.*

In the face of such a consistent conclusion from the educational professionals who best knew T.B. and such an inconsistent message from the plaintiff's evidence, it is no wonder the ALJ concluded that "the overwhelming evidence . . . establishes that the Student was capable of doing satisfactory work when he wanted to and that his poor

20

performance was due to the fact that he failed to attend an almost preposterous number of classes and rarely did either homework or class work." J.A. 36. Testimony from teachers, testimony from parents, and testimony from experts can all be effective to demonstrate a substantive violation of the IDEA. Yet many of the witnesses T.B. ultimately called turned out to be effective witnesses for PGCPS.

T.B. has given us no reason to disturb the well-reasoned conclusions of the ALJ and the district court. It is unfortunate that T.B. did not do better in PGCPS. But the fault does not lie with the school district. Teachers tried repeatedly to get T.B. to take even a modest interest in his education, and their efforts just as repeatedly came up short. Holding the school district liable for regrettable results in every case would simply deplete its resources without improving outcomes for anyone, a result Congress could not have intended.

V.

School systems have obligations under the IDEA, and PGCPS in this case defaulted in failing to promptly evaluate T.B. On the other hand, the IDEA is focused precisely and humanely on ensuring that students with disabilities are not left behind by their schools. In this case, as the ALJ found, the record is devoid of any credible evidence that an unaddressed disability caused T.B.'s educational difficulties and replete with credible evidence that T.B. himself was the cause.

Every child possesses a gift within, something unique that he or she can contribute to society. Many times special education is needed to nurture that gift. But there are times too when students need to assist educators in developing their own inner capabilities.

21

Poor motivation and poor performance do not always and invariably lie at the feet of teachers and schools. Students themselves also have to try.

Based on the foregoing, the judgment of the district court is

*AFFIRMED*.

GREGORY, Chief Judge, concurring in the judgment only:

Although I join the Court's judgment, I do so solely on the grounds that the plaintiffs failed to present sufficient evidence at the due process hearing to establish that T.B. was denied FAPE. I write separately to express my view that I cannot agree with the majority's characterization in its opinion of either T.B. and his parents or PGCPS and its employees. While I am constrained to conclude that the plaintiffs have failed to demonstrate that the school division's egregious child find violations actually interfered with the provision of FAPE, I cannot agree that the blame lies with T.B. and his parents, and that PGCPS should bear little or no responsibility for a student in its care or for the unfortunate outcome of this case. Accordingly, I concur in the judgment only.

## I.

T.B. first showed signs of academic difficulty in elementary school, where he was already performing below grade level in both reading and math. By middle school, his challenges were evident, as his grades had fallen to Cs and Ds and he failed a class for the year. T.B.'s father sounded the alarm in October of his freshman year of high school, where T.B.'s grades had continued their steady decline. He informed T.B.'s guidance counselor that T.B. was "having trouble remembering things" and was "struggling to process the information in class." He asked whether "there is a program or some kind of

test he could take. I want to help my son [sic] he need before it is too late and he fall behind."[1] J.A. 1899.

PGCPS unilaterally scheduled an IEP meeting on a date when only T.B.'s mother could attend, despite the requirement that the meeting be scheduled at "a mutually agreed on time and place." 34 C.F.R. § 300.322(a)(2). *See also* Md. Code Regs. 13A.05.01.07(D)(1). PGCPS also failed to include, as required by 34 C.F.R. § 300.321(a)(2) and Reg. 13A.05.01.07(A)(1)(b), any regular education teachers at the meeting even though he was receiving full-time regular education instruction.[2] Not surprisingly, the IEP team concluded, without testing T.B., that he was "proficient" and did not have a disability, and that no further assessment was necessary. No other academic supports were offered or provided.

When T.B.'s academic performance did not improve, and after more desperate pleas by T.B.'s parents for testing and special education services for their son,[3] T.B.'s

---

[1] This was T.B.'s parents' first request for an evaluation. Over the next few years, they made over a dozen additional requests, in writing, for testing or special education services. J.A. 1805-11, 1816, 1818, 1822, 1827, 1833, 1864, 1871, 1881, 1887, 1899, 2110, 2119.

[2] Unfortunately, this violation was not raised in the due process complaint, thus it was not considered by the ALJ or the district court, J.A. 16, and is not before this Court for consideration on appeal.

[3] T.B.'s father wrote his son's guidance counselor on January 4, 2013:

> I wanted to see if there is [sic] any programs that can help him in school or after school. He is struggling very badly and I asked him to go to his teacher after class to get further assistance. . . . He is getting discourage, [sic] because if he don't [sic] understand the concept and it [sic] not being explained then he will be lost . . . . I am open to any suggestions that you can recommend for my son, we are trying to work with him at

(Continued)

24

guidance counselor responded that T.B.'s records did not indicate a need for special education testing, and that he could not be reassigned to smaller special education classes as he was appropriately placed in regular education classes. By the end of ninth grade, T.B. failed four core subjects for the year and received a D in History. J.A. 1873. T.B. was promoted to, and then repeated the tenth grade, but his attendance was poor due to his academic and emotional difficulties. Even after T.B.'s parents provided PGCPS a copy of an IEE indicating that T.B. had a learning disability, PGCPS did nothing. It was only after his parents filed a due process complaint that PGCPS convened an IEP meeting to consider the IEE it had received at the beginning of the school year, and to pursue testing of T.B. PGCPS's testing found that T.B. had average intellectual abilities, but

---

home. He understands then but when in class it's something different. *I'm trying to save my son before he give* [sic] *up.* (emphasis added).

J.A. 1887.

Just six days later, he wrote again:

Is there way we can move [T.B.] to a smaller class? He may need to be moved from a regular class to [a] smaller group. He is having trouble keeping up in the classroom, a lot of his teachers are agreeing with me about my son. He don't [sic] understand the work and he may need to be put in [a] special classroom. Mrs. Dent, I wrote a while back about getting my son tested because he was having trouble remembering things and keeping up. When [my] wife came to the meeting on November 7th, they didn't know what to do. They looked at his transcripts and said he was proficient, and they was [sic] suppose [sic] to reschedule the meeting. Nothing happened [and] he didn't get tested or we haven't heard anything else.

If we have to go to special education classes I looking [sic] for a solutions [sic]? Do [sic] Friendly have smaller classes where he can be changed too [sic]? I was told to come to you as far as helping my son.

J.A. 1881.

was from four to seven years behind his chronological age/grade level in several academic areas. Yet the IEP team found him eligible for special education services only in the category of emotional disability. PGCPS placed T.B. in a self-contained program for students with emotional disabilities, but T.B. never attended the program and his parents never informed the school district why he did not.

## II.

I must take issue with the majority's attempt to place blame on T.B.'s parents for the regrettable outcome of his educational experience in PGCPS. The majority, in stating that the teachers' "attempts at a dialogue were often rebuffed," Maj. Op. 11, strongly suggests that T.B.'s parents displayed only a halfhearted interest in T.B.'s education, and ignored teachers' concerns about T.B.'s performance. A review of the entire record does not support such a suggestion. T.B., Sr. was a father desperate to help his son. He understood that his son stood at an academic crossroads where frustration and anxiety could cause him to give up on his education. Despite PGCPS's determination in October 2012 that T.B. was "proficient," and thus no testing was necessary, T.B., Sr. continued to advocate for his son. He regularly advised teachers, counselors and PGCPS administrators *for over two years* that he was aware of T.B.'s struggles, describing in detail problems with comprehension and focus that he believed were the result of a learning disability. He both initiated and responded to communications from teachers about absences, missed assignments, and makeup work. He also repeatedly asked for

advice about available programs and strategies to help T.B. with his learning challenges.[4]

T.B., Sr. continued to seek testing and T.B.'s placement in a classroom setting conducive to his educational needs and learning style, but his pleas fell on deaf ears.[5]  By the time PGCPS offered T.B. any type of IEP, he was several years behind academically.

---

[4] On November 20, 2013, T.B., Sr. emailed, "[I]s there anything I can do to help my son improve in your class, I see he [sic] struggling.  I think he may have trouble comprehending with the procedure on how to do what is asked of him."  J.A. 2110.  On the same date, he wrote another teacher asking the same question, but adding, "I have tried to contact you in the pass [sic] but no response I am trying to help my son."  J.A. 1871.

He emailed yet another teacher on February 10, 2014, "This year has been very trying for [T.B] and we are trying to do our best to help him focus in all of your classes."  J.A. 1868.  On the same date, he emailed a teacher a second time, stating that they "sent T.B. to the doctor on January 20 to see his pediatrician.  They wouldn't do a KAT [sic] Scan on him they said he need to be tested first by the school.  No one is trying to set this up for us.  I am willing to go as far as I have to so I will keep you informed."  J.A. 1867.

On March 6, 2014, T.B., Sr. wrote another teacher.  "For your FYI we are trying to get my son additional help with his learning, because we believe he has a learning disability.  No one wants to test him to see, I am working on this matter and I am willing to take it as far as I can to get him the help he need.  I will go over what assignments he has missed and try my best to get it to you." J.A. 1864.

[5] On March 10, 2014, T.B., Sr. contacted the school division's administrative offices:

> I writing this in concern for my son . . . .  My wife and I has [sic] seen some changes in my [son's] learning ability and we have requested for him to be tested . . . .  This request has been ignored and my son is falling behind because he don't [sic] understand what he is doing.  He writes certain letters backwards, he has a hard time remembering things which causes him to get frustrated.  All I heard . . . [is] that he is proficient, they are missing the signs.  We took him to his Pediatrician and he said the school needed to test him.  Teachers . . . has [sic] labeled my son as not wanting to do anything, but not realizing he is in trouble.  This has [sic] went on for 2 years now . . . .

> I would like to ask for special transfer to a school where he can be properly tested and to get the attention he need [sic] to better himself.  To

(Continued)

27

I submit that it was PGCPS and its employees, not T.B.'s parents, that displayed a lackadaisical attitude toward T.B.'s education. The school division and its administrators seemingly had inadequate concern for his academic success. Based on a determination made at a procedurally deficient IEP meeting, PGCPS refused to test T.B., even after it was presented with conflicting IEE testing results. PGCPS failed to offer, or even to suggest, to T.B. and his parents educational resources typically offered to regular education students to help them succeed in the classroom. Sadly, the majority places blame on T.B. and his parents, and absolves PGCPS of responsibility.

### III.

While these facts clearly demonstrate the abysmal failure of PGCPS to meet its child find obligations, this Court's holding in *DiBuo ex rel. DiBuo v. Board of Education of Worcester County,* 309 F.3d 184 (4th Cir. 2002), requires that plaintiffs demonstrate that the violation "actually interfere[d] with the provision of a free appropriate public education." *Id.* at 190. The ALJ concluded, as the majority does here, that "[n]o type or amount of special education services would have helped T.B. to achieve a FAPE" because his problems were "rooted in his refusal to go to class or attend school." Maj. Op. 16. The easy explanation for T.B.'s educational demise is that he did not attend

---

take him out of this negative environment before something happens to him.

J.A. 2119.

school regularly, and when he did, he did not put forth his best effort. The unfortunate reality of this case, however, is that the evidence presented at the due process hearing fails to answer the obvious question: "Why?" In the special education context, the answer is rarely that a student "simply does not want to go to school." J.A. 31. While one could certainly argue that the ALJ's conclusion that T.B. would not have come to school even with an appropriate IEP was speculative, the plaintiffs' evidence offered nothing to counter it.

The evidence presented by the plaintiffs failed to establish that T.B. was denied FAPE. Educational experts who could have supported the IEE's finding that T.B. had a previously undiagnosed learning disability, and established a link between the long-term denial of special education services and T.B.'s failure to attend school due to frustration and anxiety, either failed to provide helpful testimony or did not testify at all. No witness challenged in any meaningful way PGCPS's self-serving conclusion that its failures had no impact on T.B.'s lack of academic progress. No evidence effectively refuted the conclusion that T.B. did not have a learning disability, or demonstrated that T.B.'s frustration at school led to his emotional problems and school avoidance. No one testified as to why T.B. did not attend the self-contained program or otherwise accept the much delayed compensatory services offered to him. Based on the record here, I must concur with the judgment.

I reach this conclusion solely on the basis of the insufficiency of legal proof in support of the claim presented to and considered by the ALJ. It is in no wise based upon blaming T.B. or his parents. The proof of T.B.'s parents' love, support, and advocacy for

29

him is clearly demonstrated in this record. His father repeatedly made clarion cries seeking help for his son. The majority, however, concludes that the blame lies at T.B.'s feet. T.B., Sr. only wanted the school district's help to save his son before he gave up. Carl Hasen, former Superintendent of Schools in Washington, D.C., said "[e]ducation is a difficult enough process under any condition because educational effort is primarily an expression of hope on the part of the student." Sometimes a student "is asked to have faith and confidence which at the moment he is in school seems unreasonable and unjustifiable." T.B. has been denied a reason to have hope.