**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1780**

R.F., a minor child, by and through her PARENTS and next friends, E.F. and H.F.;
E.F.; H.F., on their own behalves,

Plaintiffs – Appellants,

v.

CECIL COUNTY PUBLIC SCHOOLS,

Defendant – Appellee,

and

D'ETTE W. DEVINE, Superintendent (officially); SARAH FARR, Director of
Special Education (officially),

Defendants.

------------------------------

COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC.;
DISABILITY RIGHTS MARYLAND; NATIONAL DISABILITY RIGHTS
NETWORK; THE JUDGE DAVID L. BAZELON CENTER FOR MENTAL
HEALTH LAW,

Amici Supporting Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Albert David Copperthite, Magistrate Judge.  (1:17-cv-02203-ADC)

Argued:  January 29, 2019                    Decided:  March 25, 2019

Before AGEE and HARRIS, Circuit Judges, and DUNCAN, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge Duncan wrote the opinion, in which Judge Agee and Judge Harris joined.

**ARGUED:** Wayne Darryl Steedman, STEEDMAN LAW GROUP, Lutherville, Maryland, for Appellants. David Andrew Burkhouse, PESSIN KATZ LAW, P.A., Columbia, Maryland, for Appellee. Peter J. Anthony, DENTONS US LLP, Washington, D.C., for Amici Curiae. **ON BRIEF:** Cheryl A. Steele Steedman, STEEDMAN LAW GROUP, Lutherville, Maryland; Kevin Golembiewski, BERNEY & SANG, Philadelphia, Pennsylvania, for Appellants. Adam E. Konstas, Towson, Maryland, Rochelle S. Eisenberg, PESSIN KATZ LAW, P.A., Columbia, Maryland, for Appellee. Ira A. Burnim, Lewis Bossing, THE JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW, Washington, D.C.; Richard D. Salgado, Dallas, Texas, A. David Mayhall, DENTONS US LLP, Washington, D.C., for Amicus The Judge David L. Bazelon Center for Mental Health Law. Selene Almazan-Altobelli, COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC., Towson, Maryland, for Amicus Council of Parent Attorneys and Advocates, Inc., National Disability Rights Network, and Disability Rights of Maryland.

DUNCAN, Senior Circuit Judge:

R.F., an elementary school student with a disability, and her parents (collectively "Appellants") challenge the district court's decision to affirm the determination of a Maryland Administrative Law Judge (an "ALJ") that Cecil County Public Schools ("CCPS") provided R.F. with a free appropriate public education (a "FAPE") under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.* Appellants contend that CCPS violated the IDEA by (1) failing to educate R.F. in the least restrictive environment (the "LRE"), (2) failing to implement R.F.'s Individualized Education Program (her "IEP"), (3) denying R.F.'s parents the opportunity to participate in her educational decisionmaking, and (4) providing an IEP that was inappropriate for R.F.'s needs. The ALJ found, and the district court agreed, that while CCPS violated certain procedural requirements of the IDEA, those violations did not substantively deny R.F. a FAPE in violation of the IDEA. For the reasons that follow, we affirm.

I.

R.F., who was seven years old when these proceedings began, is a CCPS student with a disability who is entitled to special education and related services under the IDEA.[1] R.F. and her parents contend that CCPS failed to comply with the IDEA in

---

[1] All facts are taken from the ALJ's findings of fact, J.A. 23–51, except where otherwise indicated. The parties agree that there are no genuine issues of material fact with these findings aside from the finding that R.F.'s behavior intervention plan (the "BIP") is "appropriate to address [her] problem behaviors." J.A. 28. We address the appropriateness of the BIP *infra*.

3

several respects and that, in so doing, CCPS denied R.F. a FAPE in violation of the IDEA. Before addressing these arguments, we first provide a brief overview of the applicable regulatory framework and the facts and procedural history of this case.

A.

The IDEA provides funds for states to educate children with disabilities, subject to conditions imposing substantive requirements on the education that is provided. 20 U.S.C. § 1412. The statute was enacted to ensure that children with disabilities have access to an education that meets their unique needs, to protect the rights of these children and their parents, and to prevent the unnecessary exclusion of these children "from the public school system and from being educated with their peers."[2] *Id.* § 1400.

To that end, the IDEA requires that participating states provide a FAPE to children with disabilities. *Id.* § 1412(a)(1). The mechanism by which a state provides a FAPE is an IEP--a document that describes the child's unique needs and the state's plan for meeting those needs. *See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017) ("The IEP is the centerpiece of the [IDEA's] education delivery system for disabled children.") (citation and internal quotation marks omitted). The IDEA requires participating states to "develop[], review[], and revise[]" an IEP for each child with a disability. 20 U.S.C. § 1412(a)(4). An IEP must contain an assessment

---

[2] The IDEA is an updated version of the Education for All Handicapped Children Act of 1975, Pub. L. No. 94-142, 89 Stat. 773 (1975) (current version at 20 U.S.C. § 1400 *et seq.*), under which some of the caselaw setting out IDEA requirements was initially developed.

4

of the child's "present levels of academic achievement and functional performance," measurable annual goals that are designed to "meet the child's needs that result from the child's disability" along with a statement of how progress toward those goals will be measured, a description of "the special education and related services and supplementary aids and services" that the school will provide for the child, and an "explanation of the extent[] . . . to which the child will not participate with nondisabled children in the regular class." *Id.* § 1414(d)(1)(A)(i). The IEP team--a group comprised mainly of school staff and a child's parents--should revise the IEP "as appropriate" to address various circumstances, including a "lack of expected progress towards the annual goals"; "the results of any reevaluation"; "information about the child provided to, or by, the parents"; "the child's anticipated needs"; or "other matters." *Id.* § 1414(d)(4)(A). The IDEA requires that a child's parents be included in the IEP decisionmaking process as members of the IEP team. *Id.* § 1414(d)(1)(B).

B.

R.F. has been diagnosed with severe autism spectrum disorder and a rare genetic disorder.[3] She generally communicates without using words, and she "exhibits complex, challenging, disruptive behaviors" such as hyperactivity and aggression. J.A. 24. Her aggressive behaviors, which include "grabbing people, pulling hair, biting, and placing

_____

[3] R.F. was one of only two people in the world diagnosed with this disorder when she received that diagnosis. The long-term consequences of this disorder, including its impact on R.F.'s educational potential, are unknown.

5

her mouth on others," often manifest during transitions in the school day. *Id.* R.F. also exhibits physical limitations--for instance, she has significant neuromuscular deficits, so she sometimes needs assistance sitting up straight and being aware of her body's position when navigating steps and curbs. R.F. "requires adult supervision and assistance at all times." *Id.* She also has a short attention span and has difficulty processing information quickly.

CCPS first identified R.F. as a student qualifying for special education and related services when she was two years old. It developed IEPs for R.F. for half-day kindergarten in the 2014–2015 school year and for full-day kindergarten in the 2015–2016 school year.

Before R.F. entered first grade, CCPS took steps to address R.F.'s behavioral issues. CCPS hired a consultant from the Kennedy Krieger Institute to instruct its staff on conducting functional behavior assessments ("FBAs") for students with significant disabilities and autism. CCPS staff conducted an FBA for R.F. in April 2016 and created a behavior intervention plan (a "BIP") for her that focused on biting as her primary interfering behavior.

The BIP set out actions for CCPS staff to take to reduce R.F.'s unwanted biting and to intervene when she began to bite. Steps to reduce R.F.'s biting included ensuring that R.F.'s NovaChat (a device that allows R.F. to press pictures on a screen to communicate) was accessible to her at all times, maintaining a "clear and consistent daily routine" and a visual schedule to ease transitions during the day, reminding R.F. of appropriate behaviors by presenting social stories to her throughout the day, providing

6

R.F. with "short verbal instructions with visual supports," and using a token reinforcement system. J.A. 29. Steps to intervene when R.F. began to bite included redirecting R.F. to her NovaChat, to appropriate oral stimulation items, or to vibration tools meant to calm R.F., followed by reviewing social stories to remind R.F. why biting is inappropriate.

As relevant to the dispute on appeal, R.F.'s IEP team--comprised primarily of CCPS staff and R.F.'s parents--met in May 2016 to revise her IEP for the 2016–2017 first grade school year (the "May 2016 IEP"). The May 2016 IEP incorporated R.F.'s BIP. It also included thirteen goals to address R.F.'s academic, behavioral, physical, and speech and language needs. The IEP team determined that to make progress on these goals, R.F. would require sixteen hours and fifty-five minutes outside the general education setting and fourteen hours and thirty-five minutes inside the general education setting each week.

R.F.'s mother attended this meeting and objected to the May 2016 IEP. She did not think that R.F. should be included in classes with nondisabled peers and requested that CCPS pay for R.F.'s tuition at the Benedictine School, a private school. The other members of R.F.'s IEP team disagreed and noted that CCPS was developing an intensive communication support classroom (an "ICSC") for children with communicative difficulties. The IEP team again met in June 2016 to evaluate R.F.'s progress on her IEP

goals before the start of the 2016–2017 school year. Appellants' arguments on appeal focus solely on the 2016–2017 school year.[4]

At the start of the 2016–2017 school year, CCPS provided most of R.F.'s special education services in the ICSC. Although CCPS anticipated the participation of other students in the ICSC, those students did not attend in the fall of 2016 due to unexpected circumstances. Consequently, R.F. was the only student in the ICSC. R.F. joined the general education classroom for "specials" (e.g. gym, art, music), recess, field trips, and occasional reading and math classes.

Mr. K., a special education teacher, provided R.F. with special education services in the ICSC. CCPS also assigned a paraprofessional to support R.F. throughout the day. In the ICSC and throughout R.F.'s day, CCPS offered R.F. a number of specialized services, including individualized supervision and instruction, and supports. These supports included objects meant to help R.F. transition to new activities and locations, a visual schedule with verbal cues, and low lighting and reduced noise. CCPS "implemented the BIP regularly, but not perfectly." J.A. 44. For instance, while Mr. K. used the behavior reduction and intervention steps in the BIP, he did not always follow them in order. To monitor R.F.'s progress toward her IEP goals, Mr. K. collected data on R.F.'s behavior and performance every other week and incorporated that data into

---

[4] Appellants initially asserted claims arising from the 2014–2015 and 2015–2016 school years, but these claims were disposed of by the ALJ below, and Appellants do not pursue them on appeal.

quarterly progress reports. He destroyed his raw data after writing the quarterly reports, even though CCPS requires teachers to maintain data for two years.

In August 2016, approximately three weeks after the start of school, Mr. K. began to notice that R.F. struggled when she joined her nondisabled peers in the general education setting. She had difficulty walking between classrooms and staying seated and quiet in the general education classroom. She also often failed to finish her lunch in the school lunchroom because she became distracted.

In response to these difficulties, Mr. K. gradually began providing more instruction to R.F. in the ICSC instead of the general education classroom. For instance, while R.F.'s schedule placed her in the general education classroom for reading comprehension, Mr. K. would sometimes remove her from that class and take her back to the ICSC. This decision varied daily and, according to Mr. K., was "responsive to her needs depending on her success in the class." S.A. 3.[5] On some days, Mr. K. was unable to take R.F. to the general education classroom "if she was exhibiting really aggressive behaviors or if she was having a really difficult time walking or with mobility." S.A. 4. As a result of these adjustments, R.F.'s hours in the ICSC exceeded the number specified in the May 2016 IEP.

In December 2016, R.F.'s IEP team met again to revise her IEP (the "December 2016 IEP"). The team decided to reduce the number of hours that R.F. spent in the general education setting so that she would only attend specials with nondisabled peers.

_____

[5] Citations to the "S.A." refer to the Supplemental Appendix filed by CCPS in this appeal.

Accordingly, the December 2016 IEP increased R.F.'s weekly time outside the general education setting from sixteen hours and fifty-five minutes to twenty-nine hours.

R.F.'s parents attended the meeting and opposed CCPS's approach. R.F.'s mother again expressed opposition to placing R.F. in a general education setting "at all during the school day." J.A. 45. R.F.'s parents also presented a report by Lisa Frank, an education consultant, who recommended placement in a "full-day evidence-based program for children with autism" like the Benedictine School. *Id.* The other members of the IEP team disagreed with this proposed placement and determined that the ICSC was the best placement for R.F.

C.

Shortly after R.F.'s IEP team compiled the December 2016 IEP, R.F.'s parents initiated this action, alleging that CCPS violated the IDEA and seeking to have R.F. placed at the Benedictine School or another private school at CCPS's expense. As required under the IDEA, they first filed a due process complaint with Maryland's Office of Administrative Hearings, resulting in a hearing before an ALJ. *See* 20 U.S.C. § 1415(f). The hearing before the ALJ addressed whether CCPS denied R.F. a FAPE or failed to offer her an IEP that would provide her with a FAPE during the 2016–2017 school year.

Mr. K testified at the hearing. As relevant to one of Appellants' principal claims concerning CCPS's procedural violations of the statute, Mr. K. stated that he was unaware that CCPS required teachers to maintain raw data for two years. The ALJ

10

concluded that he had violated CCPS's retention policy but "did not do so for any nefarious purpose," and she declined to draw any negative inferences from his testimony. J.A. 71.

The ALJ also heard evidence regarding how CCPS calculates special education hours for the purposes of preparing IEPs and recording services provided. She found that, while Maryland requires schools to define special education hours in terms of the number of hours a child spends outside the general education classroom, CCPS defines them in terms of the number of hours of instruction focused on a child's IEP goals. Therefore, the ALJ concluded that experts who testified that R.F.'s IEP contained an inadequate number of special education hours did so based on a misunderstanding of how CCPS calculates those hours.

Based on the testimony and data presented at the hearing, the ALJ evaluated R.F.'s progress on her IEP goals. She found that R.F. had made progress toward some of her physical goals as well as some of her speech and language goals. She also found that R.F. did not make progress toward her behavioral or academic goals. She concluded that, overall, R.F. had "made incremental progress on some, but not all of her goals" and that this was appropriate for R.F. "given her unique circumstances." J.A. 86.

The ALJ issued a decision holding that CCPS procedurally violated the IDEA by changing R.F.'s placement in August 2016 by gradually increasing her hours in the ICSC without notifying her parents or revising her IEP. She also concluded, however, that this violation did not deny R.F. a FAPE, crediting Mr. K.'s testimony that R.F. was having difficulty in the general education setting and benefitted from additional time in the

11

ICSC. Overall, the ALJ concluded that "CCPS offered [R.F.] 'an IEP reasonably calculated to [enable her to] make progress appropriate in light of the child's circumstances.'" J.A. 87 (quoting *Endrew F.*, 137 S. Ct. at 999).

Appellants challenged the ALJ's decision in federal district court, naming as defendants CCPS, its superintendent, and its director of special education, in their official capacities.[6] The district court granted CCPS's motion for summary judgment for reasons similar to those stated in the ALJ's decision.[7] This appeal followed.

## II.

In IDEA cases, we conduct a modified de novo review, "giving 'due weight' to the underlying administrative proceedings." *M.S. ex rel. Simchick v. Fairfax Cty. Sch. Bd.*, 553 F.3d 315, 323 (4th Cir. 2009) (citation omitted). Under our precedent, whether an educational program offered by the state is appropriate for purposes of the FAPE analysis is a question of fact.[8] We consider an ALJ's factual findings to be "*prima facie* correct." *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). However, the "ultimate decision as to whether the state has complied with the IDEA" is an independent

---

[6] Throughout this opinion, we refer to these defendants collectively as "CCPS."

[7] The district judge referred the case to a federal magistrate judge for all proceedings and the entry of judgment by consent of the parties, in accordance with 28 U.S.C. § 636(c).

[8] We note, however, that several other circuits treat the issue of whether the school district has provided a FAPE as a mixed question of fact and law. *See, e.g.*, *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 804 (8th Cir. 2011) ("Whether a child has received a FAPE is a mixed question of law and fact.").

decision made by the district court. *Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. TH*, 642 F.3d 478, 484 (4th Cir. 2011). In making this independent decision, courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982).

## III.

Appellants contend that CCPS violated the IDEA in several respects. Whether a state has violated the IDEA has procedural and substantive components. Procedurally, the state must comply with the stated requirements of the IDEA. *Id.* at 206–07. Substantively, the state must offer the child a FAPE, which requires a targeted educational program setting reasonably calculated goals for a child's progress in light of the child's particular circumstances. *Endrew F.*, 137 S. Ct. at 999.

We first reexamine our precedent in light of the Supreme Court's recent decision in *Endrew F.*, 137 S. Ct. 988, clarifying the FAPE standard. We then address Appellants' specific contentions regarding CCPS's compliance with the IDEA.

## A.

To meet the substantive requirements of the IDEA, a school must provide a child with a FAPE. *M.L. ex rel. Leiman v. Smith*, 867 F.3d 487, 499 (4th Cir. 2017). The Supreme Court recently held in *Endrew F.* that to satisfy the FAPE requirement, "a

13

school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 137 S. Ct. at 999.

In establishing this standard, the Court rejected the Tenth Circuit's approach, which held that the education and services provided to children with disabilities "must be calculated to confer *some* educational benefit" to meet the FAPE requirement and that a child's IEP "is adequate as long as it is calculated to confer an educational benefit that is merely more than *de minimis*" (the "*de minimis* standard"). *Id.* at 997 (alterations, citation, and internal quotation marks omitted). Before *Endrew F.*, we required schools to provide "some educational benefit" to a child to meet their substantive obligation to provide the child with a FAPE. *See O.S. v. Fairfax Cty. Sch. Bd.*, 804 F.3d 354, 358 (4th Cir. 2015) (quoting *Rowley*, 458 U.S. at 200) (collecting cases). This prior standard is similar to the Tenth Circuit's *de minimis* standard, and we clarify again that it is no longer good law. *See M.L.*, 867 F.3d at 496 (acknowledging that "[o]ur prior FAPE standard is similar to that of the Tenth Circuit, which was overturned by *Endrew F.*").

Instead, we follow the Court's standard as articulated in *Endrew F.* and hold that "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[9] *Endrew F.*, 137 S. Ct. at 999. This standard is framed in terms of each

---

[9] Indeed, we implicitly did so in *T.B., Jr. ex rel. T.B., Sr. v. Prince George's County Board of Education*, 897 F.3d 566 (4th Cir. 2018). In that case, we held that a school board procedurally violated the IDEA by failing to promptly evaluate a child for special education. *Id.* at 573. We concluded, however, that the school did not substantively violate the IDEA because its failure did not deny the child a FAPE. *Id.* at (Continued)

child's unique circumstances because "[a] focus on the particular child is at the core of the IDEA." *Id.* Consequently, "the benefits obtainable by children at one end of the spectrum [of disability] will differ dramatically from those obtainable by children at the other end, with infinite variations in between." *Id.* (quoting *Rowley*, 458 U.S. at 202). Our analysis is therefore grounded in each particular child's circumstances.

B.

Having established the relevant standard for the FAPE requirement, we turn to the issues on appeal in this case. In sum, we hold that CCPS did violate certain procedural requirements of the IDEA, most notably by changing R.F.'s placement without notifying her parents or modifying her IEP. However, any procedural violations did not deny R.F. a FAPE.

Appellants contend that CCPS violated the IDEA in four respects: (1) by failing to educate R.F. in the LRE, (2) by failing to implement the classroom placement in R.F.'s IEP when Mr. K. increased her hours in the ICSC, (3) by denying R.F.'s parents the right to participate in her education, and (4) by failing to provide an IEP appropriate for R.F.'s needs. We address each issue in turn.

---

575. In doing so, we quoted *Endrew F.*'s standard to explain the substantive requirement of the IDEA, but it was not central to our holding because the case did not turn on whether the child's IEP was reasonably calculated to provide the child with a FAPE. *See id.* at 571.

15

1.

Appellants contend that CCPS failed to educate R.F. in the LRE because it provided her most of her instruction in the ICSC, where R.F. was the only student. They seek an order placing R.F. at a private school where she would be educated among peers with disabilities. We reject this contention.

The IDEA requires participating states to educate children with disabilities in the LRE--that is, alongside children who are not disabled "[t]o the maximum extent appropriate." 20 U.S.C. § 1412(a)(5). It permits states to remove a child with disabilities from the "regular educational environment . . . only when the nature or severity of the disability of a child is such that education in regular classes [with appropriate supports] cannot be achieved satisfactorily." *Id.* We have acknowledged that this statutory language "obviously indicates a strong congressional preference for mainstreaming" students into the general education classroom but that "[m]ainstreaming . . . is not appropriate for every [child with a disability]." *DeVries ex rel. DeBlaay v. Fairfax Cty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989). Instead, "[t]he proper inquiry is whether a proposed placement is appropriate under the [IDEA]"--in other words, whether a child's placement--the setting where the child learns--provides the child with a FAPE. *Id.* (citation omitted).

Here, placement in the ICSC was "reasonably calculated to enable [R.F.] to make progress appropriate in light of [her] circumstances." *Endrew F.*, 137 S. Ct. at 999. The ALJ's analysis here is instructive; she noted that "CCPS was not hiding [R.F.] from her

16

peers; [R.F.] was afforded opportunities to interact with other first graders, albeit not to the degree CCPS would have preferred." J.A. 73–74. Indeed, while R.F. received most of her instruction in the ICSC, CCPS gave her multiple daily opportunities to interact with her nondisabled peers. For instance, she attended specials with the general education population and walked around the school each day to practice greeting other students. These opportunities, combined with R.F.'s instructional time in the ICSC, did not deny R.F. a FAPE, particularly where Mr. K. noted that R.F. had trouble concentrating and accessing material in the general education population. R.F. had opportunities to interact with her peers "[t]o the maximum extent appropriate," given R.F.'s unique circumstances and academic and behavioral needs. 20 U.S.C. § 1412(a)(5).

Appellants argue that the conclusions of the ALJ and the district court regarding R.F.'s placement improperly conflate the LRE and FAPE requirements. However, as they themselves recognize, the statutory obligation requires placement in the least restrictive environment *appropriate for the child's education. See Devries*, 882 F.2d at 880. As in *DeVries*, that required an environment where R.F. could benefit from "a structured program" and the opportunity for "one-to-one instruction." *Id.* at 879.

Appellants argue that they are not urging CCPS to increase the number of hours that R.F. spends with her peers who are not disabled; instead, they contend that the LRE for R.F. would include more time among peers with disabilities, and they seek placement in a private school to achieve that outcome. This argument miscomprehends the LRE requirement, which is defined in terms of the extent to which children with disabilities "are educated with children who are *not* disabled." *Id.* at 878 (emphasis added). But

17

even under Appellants' standard, CCPS did not violate the LRE requirement. Instead, the ALJ correctly noted that "CCPS thought there would be other students in the [ICSC], but it did not turn out that way" due to unforeseen circumstances. J.A. 73. CCPS cannot be said to have denied R.F. a FAPE merely because fewer students with disabilities enrolled at R.F.'s school than CCPS anticipated. Accordingly, we agree with the ALJ and the district court that CCPS did not violate the LRE requirement.

2.

Next, Appellants contend that CCPS violated the IDEA by failing to follow R.F.'s IEP. Specifically, they argue that CCPS failed to implement R.F.'s IEP when Mr. K. changed R.F.'s placement and began providing her with more instruction hours in the ICSC than her IEP called for. While this was a procedural violation of the IDEA, we hold that it was not a substantive violation because R.F. was not denied a FAPE as a result.

A school must follow procedures specified in the IDEA before changing the child's placement as identified in her IEP. *See* 20 U.S.C. § 1415(b)(3) (requiring written prior notice to the child's parents before the local education agency may change a child's educational placement). Here, CCPS did not follow these procedures before changing R.F.'s placement. Instead, Mr. K. increased her hours in the ICSC beyond those specified in her IEP without giving notice to R.F.'s parents. This constitutes a procedural violation.

18

However, as we have noted, not all procedural violations of the IDEA result in the denial of a FAPE. *T.B., Jr.*, 897 F.3d at 573. Indeed, Mr. K.'s decision to provide R.F. with more instruction in the ICSC than her IEP specified was "reasonably calculated to enable [R.F.] to make progress appropriate in light of [her] circumstances." *Endrew F.*, 137 S. Ct. at 999. Mr. K. recognized that R.F. was struggling in the general education classroom, and he determined that she would make more progress with more one-on-one instruction in the ICSC. He did so on a gradual and individualized basis, based on close attention to R.F.'s performance in a general education setting and in the ICSC. We conclude that R.F. received a FAPE when CCPS changed her placement, even though it failed to follow the IDEA's procedural requirements.

3.

Appellants also contend that CCPS violated the IDEA by taking certain actions that impeded her parents from participating in decisions about her education. The IDEA and its regulations grant the parents of a child with a disability certain procedural rights, including the right to "examine all records" relating to that child and to "participate in meetings with respect to the identification, evaluation, and educational placement" of the child. 20 U.S.C. § 1415(b); *see* 34 C.F.R. § 300.322 (setting out parent participation regulations for IEP development). The IDEA also "grants parents independent, enforceable rights" that are not limited to procedural matters, including "the entitlement to a [FAPE] for the parents' child." *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 533 (2007). We first clarify the grounds on which an ALJ may

19

determine that a violation of parents' rights under the IDEA resulted in the denial of a FAPE to a child before turning to Appellants' contentions here.

a.

Parents who seek to enforce their rights or the rights of their child under the IDEA first seek review through a due process hearing before an ALJ. 20 U.S.C. § 1415(f). In general, the ALJ must determine whether a school violated the IDEA by deciding "on substantive grounds . . . whether the child received a [FAPE]." *Id.* § 1415(f)(3)(E)(i). However, "[i]n matters alleging a procedural violation, an ALJ "may find that a child did not receive a [FAPE]" if the ALJ determines that a procedural right was violated and that the violation "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child." *Id.* § 1415(f)(3)(E)(ii)(II).

Under § 1415(f)(3)(E)(ii)(II), an ALJ must answer each of the following in the affirmative to find that a procedural violation of the parental rights provisions of the IDEA constitutes a violation of the IDEA: (1) whether the plaintiffs "alleg[ed] a procedural violation," (2) whether that violation "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child," and (3) whether the child "did not receive a [FAPE]" as a result. *Id.* § 1415(f)(3)(E). Unless an ALJ determines that a given procedural violation denied the child a FAPE, she may only order compliance with the IDEA's procedural requirements and cannot grant other forms of relief, such as private placement or

20

compensatory education. *See Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 754 n.6 (2017) ("Without finding the denial of a FAPE, a hearing officer may do nothing more than order a school district to comply with the [IDEA's] various procedural requirements.").

b.

Our analysis here starts and ends with the second prong of this standard: whether a violation of parents' procedural rights under the IDEA "significantly impeded" their opportunity to participate in decisionmaking regarding their child's education. Appellants contend that CCPS violated their parental participation rights under the IDEA by changing R.F.'s placement without involving them in an IEP meeting and by destroying data relating to R.F.'s progress on her IEP goals. We hold that neither constitutes a significant impediment to parental participation on these facts.

With respect to changing R.F.'s placement, the parties agree that "Mr. K.'s unilateral determination to alter the environment in which some of R.F.'s IEP services were offered . . . constituted a procedural violation of [the parental rights provisions of] the IDEA." Appellees' Br. at 17; *see* 20 U.S.C. § 1415(b)(3).

However, R.F.'s parents' opportunity to participate in decisionmaking regarding R.F.'s education was not "significantly impeded" when CCPS changed R.F.'s placement for four months without involving her parents. 20 U.S.C. § 1415(f)(3)(E)(ii)(II). As discussed above, in changing R.F.'s placement, CCPS provided her more special education services, not fewer, in the ICSC, consistent with her parents' objection that her

21

IEP contained too many hours in the general education classroom. CCPS did not significantly impede R.F.'s parents' participation rights when it failed to inform them that it was gradually changing R.F.'s placement in line with their expressed wishes.

Additionally, R.F.'s parents did eventually have an opportunity to participate in decisions about R.F.'s placement when her mother attended the December 2016 IEP meeting. *See D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010) (holding that a school district did not violate the IDEA when it ignored parents' letters for months but included the parents in their child's IEP meeting because "they ultimately had an opportunity to participate meaningfully in the creation of an IEP" for their child). Therefore, the only form of relief that Appellants seek--private placement for R.F.-- "cannot reasonably be traced" to CCPS's failure to include R.F.'s parents in decisions regarding her placement in August 2016. *Id.* at 566. We cannot agree with Appellants that CCPS's procedural violation of R.F.'s parents' right to participate in decisions about her placement rises to the level of a substantive IDEA violation that could be cured by private placement.

Appellants also contend that CCPS violated their parental rights under the IDEA when Mr. K. destroyed the raw data that he collected on R.F.'s progress before her parents could review it. However, as the ALJ noted, "the IDEA does not specify how often a school system should collect data or how long it should be maintained." J.A. 72. Instead, it only requires that the IEP describe how the child's progress toward her goals will be measured. 20 U.S.C. § 1414(d)(1)(A)(i)(III). The ALJ found that while Mr. K. violated *CCPS*'s records retention policy, which required him to preserve the data for two

22

years, he did not violate the IDEA when he destroyed R.F.'s raw data after making his quarterly reports. We agree that this was not a procedural violation of the IDEA.

Regardless of whether the data destruction was a procedural violation of the IDEA, R.F.'s parents could still view summaries of the data in Mr. K.'s quarterly reports. Therefore, their ability to "participate in the decisionmaking process" regarding R.F.'s education was not "significantly impeded." 20 U.S.C. § 1415(f)(3)(E)(ii)(II).

We in no way minimize the necessity of compliance with the procedural requirements of the IDEA, including those pertaining to parental participation. *See DiBuo ex rel. DiBuo v. Bd. of Educ.*, 309 F.3d 184, 191 (4th Cir. 2002) (explaining, in a case before § 1415(f)(3)(E)(ii)(II) was enacted, that "[w]e have no doubt that a procedural violation of the IDEA . . . that causes interference with the parents' ability to participate in the development of their child's IEP will often actually interfere with the provision of a FAPE to that child"). But here, we cannot find that CCPS significantly impeded R.F.'s parents' participation rights when it changed R.F.'s placement and destroyed raw data on R.F.'s progress. Accordingly, we affirm that CCPS did not violate R.F.'s parents' rights under the IDEA.

4.

Finally, Appellants contend that CCPS violated the IDEA because it failed to provide R.F. with an IEP that was sufficient to meet her needs, thus denying her a FAPE. Specifically, they contend that R.F.'s BIP was insufficient because it primarily focused on biting while ignoring R.F.'s other behaviors, that R.F.'s IEP was inadequate because it

lacked a social skills goal, and that R.F.'s IEP contained an insufficient number of hours of special education instruction to meet her needs. We disagree.

As we have discussed, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. Courts conduct this analysis with an understanding that "crafting an appropriate program of education requires a prospective judgment by school officials." *Id.*

First, with respect to the BIP, Appellants contend that it rendered R.F.'s IEP inadequate because it should have addressed behaviors other than biting.[10] However, the ALJ found that, at the time the May 2016 IEP was created, biting was R.F.'s primary problem behavior. She also deferred to testimony by Sarah Farr, CCPS's director of special education, that "[t]he skills set forth in the BIP for the primary behavior [here, biting] can be generalized to other behaviors." J.A. 68–69. Therefore, the behavior strategies in the May 2016 IEP were "reasonably calculated" in light of R.F.'s circumstances at the time that IEP was created, and CCPS did not deny her a FAPE. *Endrew F.*, 137 S. Ct. at 999.

Appellants contend that the December 2016 IEP was inadequate because it incorporated the BIP without revising it to include interventions for R.F.'s other interfering behaviors. However, Appellants present no evidence that by the time the IEP

---

[10] Although the BIP itself is defined by Maryland regulations, *see* Md. Code Regs. § 13a.08.04.02(B)(1), its incorporation by reference into R.F.'s IEP gives rise to review under the IDEA framework governing the adequacy of IEPs.

24

team met to revise R.F.'s IEP in December, CCPS was aware that biting was not R.F.'s only interfering behavior. While it is true that Mr. K. testified in March 2017 that if he were to develop a new BIP for R.F., it would include biting, hair pulling, grabbing, hitting, kicking, and scratching, this says nothing about what CCPS knew in December 2016. Without other evidence indicating that CCPS knew in December 2016 that R.F. needed interventions for behaviors other than biting, we cannot say that CCPS procedurally violated the IDEA by failing to account for those behaviors in her IEP.

Regardless, any error in failing to update the BIP did not deny R.F. a FAPE because CCPS took steps that were "reasonably calculated" to address R.F.'s behavioral needs "in light of [her] circumstances." *Id.* For instance, Farr testified that R.F.'s existing BIP was sufficient to address R.F.'s behaviors. Farr explained that R.F.'s other interfering behaviors did not need to be included in a new BIP because "they're being addressed in a very appropriate way. [CCPS is] altering the environment to change those behaviors." S.A. 24. Farr emphasized that R.F.'s interfering behaviors, including biting, have decreased because CCPS is taking steps to reduce those behaviors. Therefore, CCPS did not violate the IDEA and deny R.F. a FAPE by failing to address behaviors other than biting in the BIP that was incorporated in her May 2016 and December 2016 IEPs.

Second, with respect to whether R.F.'s IEP was inadequate because it lacked a social skills goal, the ALJ found that "[R.F.] could benefit if her IEP contained a measurable socialization goal" but noted that "an IEP is not required to contain every goal from which a student might benefit." J.A. 70. She concluded that "[t]aking the IEP

25

as a whole," R.F. "was not denied a FAPE due to the lack of a social skills goal in her IEP." *Id.* We agree and note that the IEP did build in opportunities for R.F. to practice her social skills. For instance, R.F.'s BIP included the use of social stories to remind R.F. of appropriate social interactions, and her schedule included regular walks around the building to greet students.

Finally, with respect to whether R.F.'s IEP contained inadequate hours of special education, the ALJ correctly noted that, because IEPs are prospective, Appellants cannot rely on the fact that R.F.'s hours of special education were increased in the December 2016 IEP as evidence that the May 2016 IEP was defective when created. *See* J.A. 74 ("The appropriateness of the May 2016 IEP must be judged as of the time it was adopted, not in December 2016."). The ALJ also found that Appellants' experts who testified that the May 2016 IEP contained an inadequate number of special education hours did so under an incorrect understanding of the way CCPS calculates and records special education hours. Appellants offered no other evidence that the May 2016 IEP contained an inadequate number of special education hours to enable R.F. to "make progress appropriate in light of the [her] circumstances." *Endrew F.*, 137 S. Ct. at 999. Therefore, we affirm and conclude that the content of R.F.'s IEP was sufficient to provide her with a FAPE.

5.

In sum, although CCPS violated the IDEA in some procedural respects, we affirm because it did not deny R.F. a FAPE. The education that R.F. actually received during

26

the 2016–2017 school year reinforces our decision that CCPS provided her with a FAPE. The May 2016 IEP set out thirteen goals addressing "all of R.[F.]'s identified special needs." J.A. 35. These goals "focus[ed] on the particular child." *Endrew F.*, 137 S. Ct. at 999. The IEP's use of the ICSC, with its specialized supports to target R.F.'s issues with focus and stress, "aim[ed] to enable [her] to make progress," while its efforts to include R.F. in a general educational setting for specials aimed to avoid unduly isolating her from her peers at school. *Id.*

Under this IEP, as the ALJ found, R.F. did make "progress toward achieving some of the goals on her IEP during the 2016/2017 school year," although not all of them. J.A. 46. To facilitate her progress, Mr. K. and a paraprofessional worked closely and constructively with R.F. throughout the year to determine how to best enable her to make progress towards these goals. Such efforts include an ongoing assessment of whether R.F. was able to make progress in general educational settings.

The IEP did not aim for grade-level advancement through the general curriculum or for standard letter grades because these were not considered "a reasonable prospect" for R.F. *Endrew F.*, 137 S. Ct. at 1000. But this does not indicate a failure to set "challenging objectives" for R.F. *Id.* The IEP team also revised the IEP in December 2016 to account for the progress that R.F. had made to date.

This combination of reasonably ambitious goals that were focused on R.F.'s particular circumstances and that were pursued through the careful and attentive instruction of specialized professionals provided the education that R.F. is entitled to

under the statute. We therefore conclude that CCPS provided R.F. with a FAPE despite its procedural violations of the IDEA.

## IV.

Although CCPS procedurally violated the IDEA in certain technical respects, it did not substantively violate the IDEA because it did not deny R.F. a FAPE. We therefore

*AFFIRM.*