**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-1247**

───────────────

G.M., a minor, by his parents and next friends, E.P. and G.R.M.; E.P.,

        Plaintiffs – Appellants,

   and

G.R.M.,

        Plaintiff,

   v.

WILLIAM J. BARNES; HOWARD COUNTY BOARD OF EDUCATION,

        Defendants – Appellees.

───────────────

Appeal from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, Senior District Judge.  (1:20-cv-00791-JKB)

───────────────

Argued:  January 23, 2024            Decided:  September 4, 2024

───────────────

Before WILKINSON, QUATTLEBAUM, and RUSHING, Circuit Judges.

───────────────

Affirmed by published opinion.  Judge Rushing wrote the opinion, in which Judge Wilkinson and Judge Quattlebaum joined.

───────────────

E.P., Appellant Pro Se.  Andrew Wayne Nussbaum, NUSSBAUM LAW, LLC, Clarksville, Maryland, for Appellees

RUSHING, Circuit Judge:

G.M.'s parents wanted their son, a second-grade student with dyslexia and attention-deficit/hyperactivity disorder (ADHD), to receive special education under the Individuals with Disabilities Education Act (IDEA), 84 Stat. 175, as amended, 20 U.S.C. § 1400 *et seq.* Howard County Public Schools (HCPS) determined G.M. was ineligible for special education under the statute. Pursuant to the IDEA's dispute resolution process, G.M.'s parents fought that determination before a state administrative law judge. When the administrative law judge sided with HCPS, G.M.'s parents sued in federal district court. And when the district court agreed with the administrative law judge, G.M.'s parents appealed to this Court. On appeal, G.M.'s parents argue that HCPS substantively violated the IDEA by failing to provide G.M. with needed special education. They also argue that HCPS procedurally violated the IDEA by withholding relevant information during the eligibility-determination process. After carefully considering the record, we affirm the judgment of the district court.

## I.

### A.

Congress enacted the IDEA to ensure "that children with disabilities receive needed special education services." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748 (2017). The IDEA requires that States, in return for federal funding, guarantee certain children with physical and intellectual disabilities a "'free appropriate public education'" (FAPE). *Bouabid v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 62 F.4th 851, 856 (4th Cir. 2023) (quoting 20 U.S.C. § 1412(a)(1)(A)). For most children, a FAPE entails an education

"reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) (internal quotation marks omitted). Where general education is sufficient to provide such an education, the IDEA is satisfied and no relief is required. *See Miller v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 64 F.4th 569, 575 (4th Cir. 2023). Where it is insufficient, the IDEA requires schools to work with parents to furnish "special education and related services" enabling the child to receive a FAPE. 20 U.S.C. § 1401(3)(A), (9); *see also id.* §§ 1412, 1414. In addition to this substantive right, the IDEA guarantees certain procedural rights, including the rights of parents to "examine all records" relating to their child and to "participate in meetings" regarding the identification, evaluation, and placement of their child. *Id.* § 1415(b); s*ee also R.F. ex rel. E.F. v. Cecil Cnty. Pub. Schs.*, 919 F.3d 237, 248 (4th Cir. 2019).

The IDEA envisions a "cooperative process" between parents and educators, who are expected to work together to determine whether the child has a disability, whether that disability requires special education, and what any special education should look like. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005). But the IDEA anticipates that "parents and educators will not always agree." *Bouabid*, 62 F.4th at 856. To resolve those disagreements, the IDEA directs parents to seek a "due process hearing" in the appropriate state administrative forum. 20 U.S.C. § 1415(f). "There, an impartial hearing officer determines 'whether the child received a free appropriate public education' and orders appropriate relief as necessary." *Sanchez v. Arlington Cnty. Sch. Bd.*, 58 F.4th 130, 133 (4th Cir. 2023) (quoting 20 U.S.C § 1415(f)(3)(E)(i)).

3

Once those state procedures are exhausted, the IDEA authorizes any party aggrieved by the hearing officer's determination to file a civil suit in federal court. 20 U.S.C. § 1415(i)(2)(A). As a lower federal court, the district court cannot affirm, reverse, vacate, or remand the state hearing officer's decision. *Johnson v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 20 F.4th 835, 845–846 (4th Cir. 2021). Instead, the district court conducts an independent review, deferring to the hearing officer's "regularly made" factual findings and ordering substantive or procedural relief as necessary. *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). Then, like other final decisions, the parties may appeal the district court's judgment to this Court. *See* 28 U.S.C. § 1291.

## B.

With that background established, we turn to the facts of this case. At the beginning of second grade, G.M.'s parents noticed a steep decline in G.M.'s standardized test scores compared to the previous year. Though the new scores were within the average range for students his age, G.M.'s parents grew concerned their son was suffering the adverse effects of a disability affecting his reading and writing. They contacted HCPS about special education under the IDEA.

HCPS convened an individualized education program (IEP) team, consisting of G.M.'s parents and school personnel, to assess G.M.'s eligibility for special education. In a series of IEP meetings over the course of the school year, G.M.'s parents and HCPS went back and forth over G.M.'s eligibility. G.M.'s parents secured private evaluations of their son, which tended to suggest deficiencies in reading and writing. HCPS conducted its own evaluations, which tended to suggest average performance in these areas.

4

At a standstill, HCPS concluded that G.M. was ineligible for special education under the IDEA because of his purportedly average performance. In response, G.M.'s parents removed their son from HCPS at the end of second grade and enrolled him for third grade at the Jemicy School, a private school for children with speech and language disabilities.

G.M.'s parents later filed a due process complaint against HCPS. They alleged the school system had denied G.M. a FAPE by erroneously finding him ineligible for special education and sought reimbursement for G.M.'s Jemicy tuition and related relief. Pursuant to the IDEA's dispute resolution procedures, the complaint came before a Maryland administrative law judge (ALJ). The ALJ held a six-day hearing during which both sides presented evidence, witnesses, and arguments.

The data presented to the ALJ can be grouped into four categories. First, there were the evaluations secured by G.M.'s parents. At their request, Dr. Julie Morrison performed a psychological assessment of G.M., finding that he had dyslexia, dysgraphia, and related weaknesses in phonological awareness and other areas, though her findings on ADHD were inconclusive. G.M.'s parents also secured a private evaluation from Deena Seifert, a certified speech-language pathologist. Ms. Seifert found that G.M. had above average scores in listening and grammar; average scores in organizing, semantics, and spoken language; and a low average score in speaking. She also noted specific weaknesses in certain areas, such as oral vocabulary and word retrieval.

Second, there were the assessments and evaluations associated with HCPS. During his first- and second-grade years, G.M. took the Measures of Academic Progress (MAP) test, a standardized test that measures achievement relative to peers. G.M.'s second-grade

5

scores indicated "average" achievement in reading and mathematics compared to peers, though his second-grade scores were lower than his first-grade scores. J.A. 1597. HCPS personnel also conducted their own evaluations. Michele Redmiles, an HCPS special education resource teacher, administered the Woodcock-Johnson IV test to measure G.M.'s achievement relative to students his age. That test indicated "average" achievement in reading and writing, "high average" achievement in mathematics, J.A. 546–548, and "average" achievement across a variety of subtest areas, including reading rate, reading fluency, reading vocabulary, basic writing skills, written expression, spelling, and sentence writing fluency, J.A. 550–553. Around the same time, Mary Nalepa, an HCPS school psychologist, observed G.M. in the classroom and administered two tests to measure his phonological awareness, an area of concern identified by Dr. Morrison. Those tests indicated that G.M.'s phonological awareness was average to low average and that his phonological memory was average. Mrs. Nalepa also tested for ADHD, finding elevated levels of impulsivity and inattention, consistent with her observations of G.M.'s classroom behavior. Mrs. Nalepa reported that G.M. had a phonological processing deficit and ADHD.

Third, there were the observations and assessments of G.M.'s second-grade reading and writing teacher, Rachael Clark. Ms. Clark had expressed concerns about G.M.'s reading and writing throughout the school year. She indicated, at the beginning of the year, that G.M. was "[w]orking towards curriculum standard[s]" in reading and writing, J.A. 413, and indicated, toward the end of the year, that G.M. was still "working towards curriculum standards" in writing, J.A. 549. She told the IEP team that she believed G.M.

6

had a "weakness" in written expression. J.A. 581. And she noted that G.M. often failed to turn in completed assignments, making it "difficult to fully assess" his abilities. J.A. 744. By the end of the year, however, Ms. Clark's final report card showed G.M. was "independent[ly] or with assistance meeting all of the criteria that are listed" for second grade, including for reading and writing.[1] J.A. 1442. Her Fountas & Pinnell (F&P) assessment of G.M., which informally tracks reading rate, accuracy, and comprehension, had G.M. ending the school year reading a grade-level Level M text at 62 words per minute. And her informal phonological awareness evaluation of G.M. showed him performing well, scoring between eighty and one hundred percent on every metric.

Finally, there were G.M.'s experiences with the Orton-Gillingham methodology, a "structured, multi-sensory approach to teaching language" that has proven effective for teaching children with dyslexia and dysgraphia. J.A. 272. Halfway through his second-grade year at HCPS, G.M.'s parents hired a private tutor trained in Orton-Gillingham. The tutor reported that G.M. made progress during their time together, increasing his reading rate to 80 words per minute by the end of second grade. The tutor noted, however, that because she "worked with [G.M.] at the same time the school did, it [was] difficult to tease out exactly which gains he made from the tutoring, and which from school." J.A. 795. And G.M.'s report cards and assessments from Jemicy, where Orton-Gillingham is

---

[1] G.M.'s HCPS report card listed three codes for evaluating student performance: "I – Independent," "W – With Assistance," and "N – Not Yet Apparent." J.A. 743. G.M. received a mix of "I" and "W" codes and no "N" codes. "W" meant that G.M. was able to satisfy the criteria but needed prompting, redirection, and reminders to do so.

"embedded in every subject area," indicated that he was making progress but continued to struggle with reading, writing, and behavioral control. J.A. 272.

In addition to this data, the ALJ heard testimony from witnesses on both sides. For G.M., there was his mother, E.P.; Dr. Vincent Culotta, an expert in neuropsychology; Lisa Taylor, an expert in special education with an emphasis in reading; and Erin Gittings, an expert in special education as practiced at Jemicy. E.P. testified that G.M.'s reading and writing were "laborious" and that he suffered emotional distress from his inability to keep up at school. J.A. 1730, 1753. Dr. Culotta and Ms. Taylor testified that G.M. was not achieving adequately at HCPS and that he needed special education in the form of Orton-Gillingham instruction, criticizing the contrary findings of Mrs. Redmiles and Mrs. Nalepa. Dr. Culotta met with G.M. for an hour or so before his testimony; Ms. Taylor never met G.M. Both relied on Dr. Morrison's report and neither administered an evaluation of G.M. themselves. Lastly, Ms. Gittings testified about special education at Jemicy and noted that the school does not require its instructors to be state-certified special educators.

For HCPS, the ALJ heard from Ms. Clark, an expert in general education; Mrs. Redmiles, an expert in special education; Mrs. Nalepa, an expert in school psychology; and three others associated with HCPS. Ms. Clark testified that G.M.'s reading ability placed him "in the middle" of the class, J.A. 1461, that writing was his "weakest area[,] and [that] overall he was not meeting" the curriculum standards in writing, J.A. 1477. Mrs. Redmiles and Mrs. Nalepa testified about the assessments they administered and about G.M.'s average performance on them, while defending their methodologies from the criticism of G.M.'s experts.

8

Following the hearing, the ALJ issued a fifty-four-page written decision agreeing with HCPS. Weighing the evidence, the ALJ found that G.M. presented a "very average picture of achievement across all areas." J.A. 287. The ALJ explained that the data showed G.M. performing averagely for a second-grade student and that she found the HCPS witnesses more compelling for a variety of reasons. "On the issue of achievement," the ALJ found the "expert testimony more persuasive than [G.M.'s] mother's testimony" because E.P., while "very knowledgeable about her son," was "not an educator." J.A. 282. The ALJ then explained that while she found all the expert testimony "helpful," J.A. 283, she considered the HCPS experts more persuasive because their testimony was often rooted in "direct knowledge" of G.M., J.A. 282. Dr. Culotta and Ms. Taylor (and Ms. Gittings) had little to no direct knowledge of G.M. By contrast, Ms. Clark had observed G.M. daily, and Mrs. Redmiles and Mrs. Nalepa "not only interpreted the test results, [but also] conducted assessments and observations of [G.M.]." J.A. 283. And unlike Dr. Morrison, who did not testify, Mrs. Redmiles and Mrs. Nalepa "were able to discuss their conclusions at the hearing." J.A. 283. The ALJ therefore assigned "greater weight" to Mrs. Redmiles's and Mrs. Nalepa's findings than to those of Dr. Culotta, Ms. Taylor, or Dr. Morrison. J.A. 283. The ALJ found that G.M. was an average student.

Turning to the statute, the ALJ determined that G.M. did not qualify as a "child with a disability" under the IDEA. 20 U.S.C. § 1401(3)(A). To qualify, G.M. had to demonstrate that he had a qualifying disability and "by reason thereof" needed special education and related services. *Id.* G.M.'s parents argued their son had two qualifying disabilities: a "specific learning disability" (SLD) arising from his dyslexia and dysgraphia,

9

and an "other health impairment" (OHI) arising from his ADHD. *See id.* § 1401(3)(A)(i). The ALJ concluded that G.M. did not have an SLD because he failed to exhibit the requisite "pattern of [academic] strengths and weaknesses" relative to age or state-approved grade-level standards. Md. Code Regs. 13A.05.01.06(D)(3); 34 C.F.R. § 300.309(a). The ALJ found that G.M. did have an OHI but concluded that G.M. did not, "by reason thereof," need special education because he was performing adequately relative to grade-level standards. 20 U.S.C. § 1401(3)(A)(ii). Alternatively, the ALJ held that even if G.M. needed Orton-Gillingham, that methodology was not "special education" because it "can be used to teach children who are not dyslexic" in the context of general education. J.A. 294. The ALJ dismissed the complaint and denied the request for tuition reimbursement.

G.M.'s parents then filed this action in federal court. *See G.M. v. Martirano*, No. CV JKB-20-0791, 2021 WL 409856, at *1 (D. Md. Feb. 5, 2021). Applying our precedent, the district court concluded that the ALJ's factual findings were "regularly made" and deferred to them. *Id.* at *5. With that deference established, the district court concluded that G.M.'s parents could not show they were entitled to substantive relief under the IDEA. *Id.* at *6–7. The district court entered judgment for HCPS, and this appeal followed.[2]

---

[2] The district court granted "summary judgment" to HCPS. *See G.M.*, 2021 WL 409856, at *7. "Although a district court's review of IDEA administrative proceedings is typically conducted on motions for summary judgment, this is a procedural misnomer. More precisely, the IDEA requires that a reviewing court (1) receive the record of the administrative proceeding, (2) hear additional evidence at the request of a party, and (3) base its decision on the preponderance of the evidence." *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 516–517 (4th Cir. 2014) (emphasis omitted) (citing 20 U.S.C. § 1415(i)(2)(C)).

II.

A.

We conduct a modified de novo review in IDEA cases, applying the same standards as the district court and affording "due weight" to the state administrative proceedings. *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–531 (4th Cir. 2002) (internal quotation marks omitted).[3]  To afford "due weight," we treat the state hearing officer's factual findings and credibility determinations as "*prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding," so long as the findings were "regularly made." *Doyle*, 953 F.2d at 105.

When assessing whether findings were regularly made, our Court focuses on the "'*process* through which the findings were made,'" not the results of that process. *Bouabid*, 62 F.4th at 857 (quoting *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty.*, 516 F.3d 254, 259 (4th Cir. 2008)).  Focusing on process, our Court has held that findings are regularly made if the hearing officer "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *J.P.*, 516

---

[3] The statute requires district courts to "receive the records of the administrative proceedings" and "hear additional evidence at the request of a party."  20 U.S.C. § 1415(i)(2)(C).  Where a district court does not rely solely on "factual recitations" from the administrative record but instead hears and makes findings based on "additional evidence," we review those findings for clear error.  *MM*, 303 F.3d at 531.  "Because the parties here did not present additional evidence to the district court, this broader standard of review is not implicated."  *E.L.*, 773 F.3d at 517 n.4.

11

F.3d at 259. If the hearing officer employs a process that is not "far from the accepted norm of a fact-finding process," *id.* (internal quotation marks omitted), we can rely on her findings when making our independent decision based on a "preponderance of the evidence," 20 U.S.C. § 1415(i)(2)(C)(iii). *See also Bouabid*, 62 F.4th at 857. And if we depart from the hearing officer's findings, we must "explain why." *Doyle*, 953 F.2d at 105; *see also Cnty. Sch. Bd. of Henrico Cnty. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 306 (4th Cir. 2005) (noting that courts must "explain [their] reasons for rejecting the findings of the hearing officer").

Finally, and regardless of whether we rely on the ALJ's findings, the party seeking relief under the IDEA bears the burden of proof by a preponderance of the evidence. *O.S. v. Fairfax Cnty. Sch. Bd.*, 804 F.3d 354, 360 (4th Cir. 2015) (citing *Schaffer*, 546 U.S. at 51), *abrogated on other grounds by Endrew F.*, 137 S. Ct. 988, *as recognized by R.F.*, 919 F.3d 237. When assessing whether that burden has been met, we are not entitled to "substitute [our] own notions of sound educational policy for those of local school authorities." *Hartmann ex rel. Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir. 1997). To the contrary, we remain mindful that the "IDEA requires great deference to the views of the school system rather than [to] those of even the most well-meaning parent." *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 328 (4th Cir. 2004).

### B.

The ALJ's factual findings and credibility determinations were regularly made. The ALJ conducted a six-day hearing during which both sides were allowed to present evidence and arguments. Following that hearing, the ALJ issued a written decision explaining her

12

determination.  This process was well within the accepted norm of a fact-finding process, so the ALJ's findings are *prima facie* correct and can be relied upon when conducting our own independent review.  *See J.P.*, 516 F.3d at 259; *Doyle*, 953 F.2d at 105.

G.M.'s arguments run up against the standard we have previously identified.  G.M.'s overarching contention is that the "ALJ's factual findings and credibility determinations are inconsistent with the evidence and thus, not regularly made."  Opening Br. 22–23.  This argument is virtually always bound to fail because it imports a merits conclusion into what is supposed to be a procedural inquiry.  *See Bouabid*, 62 F.4th at 857.  We cannot know what is inconsistent with the evidence until we consider the merits and figure out whose interpretation of the evidence is correct.  And that substantive inquiry would defeat the point of focusing on procedure, namely, to accord proper deference to the "original finder of fact" in this necessarily "fact-intensive" class of cases.  *T.B., Jr. ex rel. T.B., Sr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 574–575 (4th Cir. 2018) (internal quotation marks omitted).  We thus reject G.M.'s attempt to merge this procedural inquiry with the merits.[4]

G.M. next argues the ALJ's factual findings were not regularly made because the written decision "did not consider" the testimony of one of his witnesses, Ms. Gittings.

---

[4] For this reason, G.M.'s argument that the ALJ's credibility determinations about Mrs. Redmiles and Mrs. Nalepa were irregularly made fails.  Relying on his experts, G.M. argues that Mrs. Redmiles and Mrs. Nalepa each used "flawed metholog[ies]" in their assessments of G.M.  Opening Br. 27.  But that argument boils down to a disagreement between the parties' experts over how best to collect and interpret data.  The substantive question of which set of experts was right does not implicate the procedural question of whether the credibility determinations were regularly made.

13

Opening Br. 22. The ALJ summarized Ms. Gittings's testimony in a paragraph. That shows she considered it. *See J.P.*, 516 F.3d at 262.

Even if the written decision had not referenced Ms. Gittings's testimony, we would not infer that the ALJ failed to consider it. Hearing officers are not required to address every data point in the record for their findings to be regularly made. *See id.* (explaining that the "level of detail required of a hearing officer is relatively low"). Indeed, this Court has treated findings as regularly made even for decisions that were "about as bare-boned as they could be." *Id.* (deferring to written decision that provided "no explanation of which evidence the hearing officer found to be most important or why the hearing officer was persuaded by the School Board's evidence"). Under our precedent, a "bare-boned" written decision "does not provide a basis for concluding that the factual findings contained in a statutorily compliant written opinion were not regularly made and therefore not entitled to deference." *Id.*

G.M. also argues that the ALJ's credibility determinations were not regularly made because his experts were better credentialed and more credible than HCPS's. "Credibility determinations run the gamut," however, and state hearing officers are not required to use any particular metric when assessing credibility. *Bouabid*, 62 F.4th at 859 (explaining that hearing officers "may assess credibility based simply upon an intuitive impression of candor"). Moreover, hearing officers are not required to provide an explanation for "accepting the testimony of one witness over that of another." *Z.P.*, 399 F.3d at 306–307 (noting that "credibility determinations implicit in a hearing officer's decision are as

14

entitled to deference under *Doyle* as explicit findings"). That the ALJ *did* provide an explanation simply confirms that her credibility determinations were regularly made.[5]

Lastly, G.M. argues the ALJ's factual findings and credibility determinations were not regularly made because the written decision "entirely disregarded" G.M.'s mother's testimony. Opening Br. 22. G.M. stresses that his mother was a "member of the IEP team" and that the IEP process is informed by "the input of the child's parents." Opening Br. 22 (internal quotation marks omitted). The right of parents to participate in the IEP eligibility process does not mean that hearing officers are required to credit parent testimony. Hearing officers may discount any witness's testimony, so long as their reasons for doing so are not arbitrary. *See J.P.*, 516 F.3d at 259–261.

And, further, the ALJ did not "entirely disregard" E.P.'s testimony. The ALJ explained that on "the issue of achievement," she found E.P.'s testimony less "persuasive" than that of the professional educators, even though E.P. was "very knowledgeable about

---

[5] G.M. directs our attention to the ALJ's apparent misstatement that "[m]ost of the [HCPS] witnesses had daily contact with the Student," J.A. 282, arguing this shows the ALJ's credibility determinations were based on an incorrect premise. The ALJ did not rest her credibility determinations on "daily contact" between G.M. and the HCPS witnesses. Instead, the ALJ devoted four paragraphs to explaining why she credited some witnesses more than others. She explained that G.M.'s expert witnesses had "little direct knowledge of the Student," since none had administered assessments to G.M. or spent much time with him. J.A. 282. By contrast, G.M.'s teacher, Ms. Clark, had "observed [G.M.] daily," while other HCPS witnesses, namely Mrs. Redmiles and Mrs. Nalepa, had "conducted assessments and observations" of him. J.A. 283. The ALJ concluded: "To the extent that certain of the HCPS witnesses have direct knowledge of the Student, his achievement and behavior, and the processes followed by HCPS, I give more weight to their testimony." J.A. 282. Needless to say, this explanation does not evince abdication of the ALJ's responsibility to decide the case. *See J.P.*, 516 F.3d at 259.

15

her son." J.A. 282. Once again, this explanation simply confirms that the ALJ's factual findings and credibility determinations were regularly made.

In sum, the ALJ conducted a proper hearing during which both sides were allowed to present evidence and arguments. Because the ALJ's factual findings and credibility determinations were regularly made, we are permitted to rely on them when making our "independent decision based on a preponderance of the evidence." *Doyle*, 953 F.2d at 103. To the extent we wish to depart from those findings, we will be required to justify that departure. *MM*, 303 F.3d at 531; *see also A.B.*, 354 F.3d at 327 (faulting district court for failing to explain "how it, despite the fact that it was reviewing a cold record, reached a conclusion completely contrary to that of the ALJ, who conducted the proceedings"). With deference established, we turn to the substance of this case.

## C.

The IDEA guarantees special education for children who qualify as a "child with a disability." 20 U.S.C. § 1401(3), (14), (29). The term "child with a disability" is defined, in relevant part, as a child "(i) with . . . other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services." *Id.* § 1401(3)(A); *see also* Md. Code Ann., Educ. § 8-401(a)(2). We consider each relevant element—"specific learning disabilities," "other health impairments," "special education," and "by reason thereof, needs"—below.

16

i.

We first consider whether G.M. had a "specific learning disability."  The IDEA lists "specific learning disabilities" (SLDs) as among the disabilities that may entitle a student to special education under the statute.  20 U.S.C. § 1401(3)(A).  It defines an SLD as:

> a disorder in 1 or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. . . . Such term includes such conditions as . . . dyslexia . . . ."

*Id.* § 1401(30); *see also* 34 C.F.R. § 300.8(c)(10) (same).

Consistent with that definition, federal regulations provide that "[a] State must adopt . . . criteria for determining whether a child has a specific learning disability as defined in § 300.8(c)(10)."  34 C.F.R. § 300.307(a).  Maryland has done so.  Its regulations provide that an IEP team "shall determine that a student has an SLD if":

> The student does not achieve adequately for the student's age or meet State-approved grade level standards when provided with learning experiences appropriate for the student's age and ability levels in one or more of the following areas:
>
> (i) Oral expression;
> (ii) Listening comprehension;
> (iii) Basic reading skills;
> (iv) Reading fluency skills;
> (v) Reading comprehension;
> (vi) Written expression;
> (vii) Mathematics calculation; or
> (viii) Mathematics problem solving[.]

Md. Code Regs. 13A.05.01.06(D)(2)(a).

17

The Maryland regulations identify two metrics by which an IEP team can determine that a student's achievement is inadequate and forms the basis for an SLD. Those two metrics ask whether the student:

> (i) Does not make sufficient progress to meet age or State-approved grade-level standards in one or more of the areas identified in §D(2) of this regulation, when using a process based on the student's response to scientific research-based intervention; or
>
> (ii) Exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade-level standards, or intellectual development.

*Id.* 13A.05.01.06(D)(3).[6]

HCPS used the "pattern of strengths and weaknesses" metric to determine whether G.M. had an SLD. Therefore, the question is whether HCPS was, by a preponderance of the evidence, correct to conclude that G.M. did not exhibit "a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade-level standards, or intellectual development."[7]

---

[6] Neither party disputes that the Maryland regulations are consistent with the federal regulations, which use near identical language when discussing the SLD determination process. *See* 34 C.F.R. § 300.309; *see also M.L. ex rel. Leiman v. Smith*, 867 F.3d 487, 493 n.5 (4th Cir. 2017) (explaining that the "Maryland statutes and regulations designed to implement the IDEA . . . do not deviate materially from their federal counterparts").

[7] The parties do not focus on the third comparator, "intellectual development." 34 C.F.R. § 300.309(a)(2)(ii); Md. Code Regs. 13A.05.01.06(D)(3)(ii). G.M. makes a passing reference to his MAP scores indicating a "weakness relative to [his] intellect," Opening Br. 39, but "a party forfeits an argument by failing to develop it in the opening brief, even if its brief takes a passing shot at the issue," *United States v. Smith*, 75 F.4th 459, 468 (4th Cir. 2023) (internal quotation marks omitted).

During the eligibility process, HCPS found that G.M. had a *strength* in mathematics problem solving, a conclusion "based on standardized assessment data, instructional level above grade level, and teacher report." J.A. 580. G.M.'s parents agreed. They disagreed, however, with HCPS's determination that G.M. did not exhibit a *weakness* in reading or writing, such that no "pattern of strengths and weaknesses" was discernable. The ALJ found for HCPS. In particular, the ALJ found that G.M. demonstrated "average . . . achievement" in reading and writing, not a *weakness* in either. J.A. 287. We see no need to depart from that finding. And while it is not necessary to explain our reasons for relying on regularly made factual findings, which are *prima facie* correct, we do so here to provide a fulsome response to the parties' arguments.

The record does not indicate—by a preponderance of the evidence—that G.M. had a weakness in reading (*i.e.*, basic reading, reading fluency, or reading comprehension). G.M's second-grade MAP reading scores showed him in the "average range" for students his age, notwithstanding a drop in percentile rank from the previous year. J.A. 1597. G.M.'s Woodcock-Johnson IV scores placed him "in the Average range of [reading] achievement (SS 98) for a student of his age." J.A. 546 (emphasis omitted). And that assessment found that G.M.'s scores in reading, broad reading, basic reading, reading rate, passage comprehension, letter-word identification, sentence reading fluency, and word reading fluency were within "average range." J.A. 1523–1524. Mrs. Nalepa's tests found that G.M.'s phonological awareness was "Low Average" and that his phonological memory, blending, segmenting, rhyming, and the like were "average." J.A. 931. Inside the classroom, Ms. Clark testified that G.M.'s reading put him "in the middle somewhere"

of his class.  J.A. 1461.  And her final report card indicated that G.M. was "On Grade" for reading instruction, J.A. 743, and was "independent[ly] or with assistance meeting all of the criteria that are listed" for reading, J.A. 1442.

G.M. highlights other evidence from the record.  Dr. Morrison's report indicated that G.M. suffered from serious phonological deficiencies, but that must be weighed against Mrs. Nalepa's and Ms. Clark's phonological findings, as well as Dr. Morrison's own finding that G.M.'s "early reading skills were average." J.A. 441.  Ms. Clark did note, toward the beginning of the school year, that G.M. was "[w]orking towards curriculum standard[s]" in reading.  J.A. 413.  But HCPS witnesses testified that students are not expected to master the curriculum until the "end of second grade." J.A. 1546.  Indeed, Ms. Clark indicated, toward the end of the year, that G.M. *was* "meeting curriculum standards" in reading.  J.A. 547.  G.M. also argues that the drop in his MAP scores shows he had a weakness in reading, since he did much better when the test was read aloud to him in first grade than when he was forced to read it himself in second grade.  But there was testimony in the record that the MAP questions became "more complex" for G.M. in second grade, "adjust[ing] based on" his solid performance in first grade.  J.A. 1548.  And putting that aside, the drop in test scores is consistent with G.M. being an average reader, one who perhaps benefited from the questions being read aloud.

G.M. focuses on his purportedly slow reading rate.  The record suggests that HCPS's goals for second graders is instruction in Level J–M texts at a rate of approximately 75–120 words per minute.  *See* J.A. 1037–1038.  Ms. Clark's F&P benchmark assessment, which tracked reading rate, accuracy, and comprehension, indicated that G.M. hovered

20

around Level J texts for months, ending the year on Level M with a reading rate of around 62 words per minute. Because HCPS's own documentation stated that G.M. was "working towards the expected words per minute for [F&P]," J.A. 1037, G.M. argues he had a weakness in reading fluency, defined as "reading accuracy and rate," *see* Md. Code Ann., Educ. § 4-136(a)(2).[8] There are several problems with this. First, there was contrary evidence in the record, such as Mrs. Redmiles's finding that G.M.'s reading rate and word reading fluency were average. G.M. himself introduced evidence indicating that his reading rate was higher. *See* J.A. 795 (tutor explaining G.M.'s reading rate "moved to about 80 words/minute" by end of second grade). Second, G.M. has not demonstrated what magnitude of deviation from the expected words per minute would translate to a cognizable weakness in reading fluency. Third, we afford "great deference to the judgment of education professionals in implementing the IDEA," and none of those professionals found that G.M.'s slower reading would amount to a weakness in fluency. *E.L.*, 773 F.3d at 517. For these reasons and those already discussed, we see no need to depart from the ALJ's finding that G.M. did not have a weakness in reading.

The record is more mixed concerning G.M.'s writing. Ms. Clark, the person with arguably the most direct knowledge of G.M.'s second-grade writing, raised concerns about it throughout the school year. She told the IEP team she believed G.M. had a "weakness" in written expression. J.A. 581. She indicated toward the end of the school year that G.M.

---

[8] G.M. also cites data from Jemicy indicating that G.M. began his third-grade year with a slow reading rate. *But see* J.A. 1220 (Ms. Gittings explaining that the Jemicy data is "nothing that you can look at and say, oh, you know, he's at this grade level.").

was still "working towards curriculum standards" in writing.  J.A. 549; *see also* J.A. 1032. When discussing G.M.'s writing on his final report card, she noted that "[m]any assignments this year were missing, incomplete or not turned in, making it difficult to fully assess [G.M.'s] abilities."  J.A. 744.  And she testified, "overall, I definitely think that writing was [G.M.'s] weakest area and would say overall he was not meeting" curriculum standards.  J.A. 1477.

By contrast, formal assessments indicated that G.M.'s written expression was average.  Mrs. Redmiles's Woodcock-Johnson IV testing found that G.M. displayed "average" writing achievement.[9]  J.A. 548.  Dr. Morrison found that G.M. had "average" scores in written expression, though his alphabet writing fluency was at the "lowest end of the average range."  J.A. 442.  And notwithstanding her concerns, Ms. Clark's final report card showed G.M. "independent[ly] or with assistance meeting all of the criteria that are listed" for writing.  J.A. 1442.  Moreover, G.M. has failed to distinguish between struggling in writing, which he undoubtedly did, and having a "weakness" in written expression under the implementing regulations.

Deference to the ALJ and HCPS resolves this question.  The ALJ heard testimony, including cross-examination, about whether G.M.'s writing constituted a weakness relative to age or state-approved grade-level standards.  The ALJ found that it did not, and we defer

---

[9] G.M. suggests that HCPS (and the ALJ) used this "one data point" to "negate" the "legions of evidence" showing that G.M. had a weakness in writing.  Opening Br. 36.  To the contrary, the record shows that HCPS drew upon "information from a variety of sources," as required by law.  34 C.F.R. § 300.306(c)(1)(i).  Whether HCPS weighed that information correctly when reaching its decision is an issue to which we accord the school system "great deference."  *E.L.*, 773 F.3d at 517.

22

to those factual findings and credibility determinations. *See T.B., Jr.*, 897 F.3d at 575 ("ALJs are typically in a far superior position to evaluate witness testimony than are reviewing courts" and "almost inevitably rely on various cues that are lost on an appellate court later sifting through a paper record." (internal quotation marks and ellipses omitted)). Similarly, "great deference" is owed to the "views of the school system." *A.B.*, 354 F.3d at 328. Respect for regularly made factual findings and deference to the school system point to the same conclusion here: G.M. did not have a weakness in written expression.[10] And since he had no pattern of strengths and weaknesses relative to age or state-approved grade-level standards, G.M. did not have an SLD.

Before concluding, we stress that district courts may rely on regularly made factual findings without further justification or explanation. Explanation is required for *departing* from such findings, not relying upon them. *See MM*, 303 F.3d at 531. Our caselaw does not require district courts (or this Court) to recapitulate the entire record to justify reliance on regularly made findings. *See Doyle*, 953 F.2d at 105. We have done so here in response

---

[10] G.M. argues that the ALJ applied the wrong legal standard when assessing whether he had a weakness in reading and writing. According to him, the ALJ relied on a "mere improvement" standard, Opening Br. 40, under which a child who "makes any gains" during the year cannot qualify for special education, Reply Br. 7. G.M. argues that the ALJ was required to consider whether and to what degree G.M. was performing "below grade level." Opening Br. 31. As our discussion should make clear, we think the ALJ did just that. The ALJ did not rely on G.M.'s improvement without regard to how his starting and ending position compared to same-aged peers. Rather, the ALJ noted various data points suggesting that G.M. was objectively average, while adding that his improvement over the course of the year provided further evidence that G.M. did not have a weakness in reading and writing. A student's trajectory over the course of a school year can of course be relevant when assessing his strengths and weaknesses.

to the parties' arguments, particularly the charge that the district court "did not thoroughly or carefully review the record," Opening Br. 23, an assertion we reject.

## ii.

We next consider whether G.M. had an "other health impairment." The IDEA lists "other health impairments" (OHIs) as another category of disability that may entitle a student to special education. 20 U.S.C. § 1401(3)(A). The federal regulations define "other health impairment" as:

> having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—(i) Is due to chronic or acute health problems such as . . . attention deficit disorder or attention deficit hyperactivity disorder . . . ; and (ii) Adversely affects a child's educational performance.

34 C.F.R. § 300.8(c)(9); *see also* Md. Code Regs. 13A.05.01.03(B)(51) (materially same).

The parties agree that G.M. has ADHD and that his ADHD adversely affects his educational performance. *G.M.*, 2021 WL 409856, at *6. Therefore, G.M. has a qualifying disability in the form of an OHI.

## iii.

We now turn to the meaning of "special education." A "child with a disability" is a child with a qualifying disability, such as an SLD or OHI, who, by reason thereof, needs "special education and related services." 20 U.S.C. § 1401(3)(A); *see also* Md. Code Ann., Educ. § 8-401(a)(2). The parties dispute whether the Orton-Gillingham instruction G.M. was requesting from HCPS qualifies as "special education."

24

The IDEA defines "special education" as "specially designed instruction." 20 U.S.C. § 1401(29); *see also* Md. Code Ann., Educ. § 8-401(a)(5). And federal regulations define "specially designed instruction" as:

> adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction—(i) To address the unique needs of the child that result from the child's disability; and (ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.

34 C.F.R. § 300.39(b)(3); *see also* Md. Code Regs. 13A.05.01.03(B)(72).

The ALJ concluded that Orton-Gillingham did not qualify as "special education" because it "can be used to teach children who are not dyslexic outside of special education." J.A. 294; *see also* J.A. 296–297. We cannot accept that reasoning. First, the record indicates that Orton-Gillingham is a "methodology" that addresses the "unique needs" of dyslexic children to "ensure access of the [children] to the general curriculum." 34 C.F.R. § 300.39(b)(3). Indeed, the Maryland Department of Education describes "structured literacy instruction" like Orton-Gillingham as a "highly recommended" form of "specially designed instruction" that has been "demonstrated through research to teach skills" affected by "persistent reading disabilities, such as dyslexia." J.A. 1050, 1159. Second, since HCPS "does not currently use Orton-Gillingham," J.A. 512, the school system likely would have had to adapt the "content, methodology, or delivery" of its instruction. That suggests that Orton-Gillingham can qualify as "special education." The ALJ's belief that Orton-Gillingham is general education simply because it can be used to teach nondisabled children strikes us as mistaken.

25

HCPS acknowledges that Orton-Gillingham "*can be* specially designed instruction" but argues it just isn't here. Response Br. 46. HCPS emphasizes that Orton-Gillingham, as requested by G.M. and as practiced at Jemicy, is not special education because Jemicy instructors are not required to be certified special education teachers. But "the IDEA does not define 'special education' to include only education by certified special education teachers, but rather encompasses a broader range of instruction." *Q.C-C. v. District of Columbia*, 164 F. Supp. 3d 35, 51 (D.D.C. 2016).

Though we reject the ALJ and HCPS's reasons for concluding that Orton-Gillingham is not "special education," the record is unclear as to how Orton-Gillingham was practiced by G.M.'s tutor or at Jemicy and what specific type of instruction G.M. was requesting. We thus assume, without deciding, that the Orton-Gillingham instruction requested by G.M. was "special education."

iv.

Lastly, we consider whether G.M. needed special education. A student qualifies as a "child with a disability" only if he "needs" special education because of his qualifying disability. 20 U.S.C. § 1401(3)(A); *see also* Md. Code Ann., Educ. § 8-401(a)(2). "Neither the IDEA nor federal regulations define what it means to 'need' special education and related services." *Lisa M. v. Leander Indep. Sch. Dist.*, 924 F.3d 205, 216 (5th Cir. 2019) (internal quotation marks and brackets omitted). However, this Court has held that "a student does not 'need' such services if the student is already getting what would qualify as a [FAPE] *without* them." *Miller*, 64 F.4th at 575.

26

A FAPE entails "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001. It is not synonymous with "the best possible education." *MM*, 303 F.3d at 526; *see Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 200 (1982) ("[T]he Act [does not] require[] [States] to maximize the potential of each handicapped child . . . ."). "[F]or most children," namely, those "integrated in the regular classroom," a FAPE means an educational program "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Endrew F.*, 137 S. Ct. at 999–1000 (internal quotation marks omitted). "Progress through this system is what our society generally means by an 'education.'" *Id.* at 999 ("Regular examinations are administered, grades are awarded, and yearly advancement to higher grade levels is permitted for those children who attain an adequate knowledge of the course material." (internal quotation marks omitted)). "And access to an 'education' is what the IDEA promises"—no more, no less. *Id.*

G.M. received a FAPE. The record indicates that G.M. was fully integrated in the regular classroom; was "able to do second grade work in [a] second grade class," J.A. 1445; received passing marks and was "independent[ly] or with assistance meeting all of the criteria that are listed" for second grade, J.A. 1442; and was advancing from grade to

grade.[11]  We see no need to depart from the ALJ's finding that, notwithstanding his OHI, G.M. did not "need" special education given his average achievement.[12]

G.M.'s parents understandably do not want to settle for average achievement, so defined.  E.P. testified before the ALJ that she found it "alarming and concerning" to see her son's MAP scores drop given his "IQ and [the fact] that he's a bright kid."  J.A. 1293.  No parent wants to see their child not reaching his or her academic potential.  But the IDEA is not a vehicle for securing a "'potential-maximizing education.'"  *M.L.*, 867 F.3d at 495 (quoting *Rowley*, 458 U.S. at 197 n.21).

In sum, G.M. did not qualify as a "child with a disability" because he did not "need" special education and related services, and he did not "need" those services because he was "already getting what would qualify as a [FAPE] without them."  *Miller*, 64 F.4th at 575 (emphasis omitted).  Because G.M. was ineligible for special education, HCPS did not substantively violate the IDEA by declining to provide it to him.

---

[11] Failing marks or nonadvancement from grade to grade does not necessarily mean that a child has been denied a FAPE.  The ultimate standard for receipt of a FAPE is an education "reasonably calculated" to enable "progress appropriate in light of the child's circumstances."  *Endrew F.*, 137 S. Ct. at 1001.  Some children's circumstances preclude passing marks or grade-level advancement, so a FAPE would look different for them.  Conversely, a child may receive an education "reasonably calculated" to enable grade-level advancement, and yet fail to make use of it.  That child has not been denied a FAPE.  *See T.B., Jr.*, 897 F.3d at 578 ("Poor motivation and poor performance do not always and invariably lie at the feet of teachers and schools.  Students themselves also have to try.").

[12] While G.M. received Orton-Gillingham tutoring during the latter half of second grade, there is no indication that G.M. would not have achieved grade-level advancement absent that instruction.

D.

G.M. also alleges that HCPS procedurally violated the IDEA by denying his parents their procedural rights to "examine all records" relating to him and to "participate in [IEP] meetings." 20 U.S.C. § 1415(b)(1).[13]  Without finding a substantive violation, however, a hearing officer or court "'may do nothing more than order a school district to comply with the [IDEA's] various procedural requirements.'" *R.F.*, 919 F.3d at 248 (quoting *Fry*, 137 S. Ct. at 754 n.6).  We have already determined that G.M. was not denied a FAPE, so he is limited to procedural relief.[14]

G.M. does not seek procedural relief, perhaps because HCPS provided the allegedly withheld information during the due process hearing.  Instead, G.M. seeks substantive

---

[13] G.M. also alleges that the ALJ committed procedural violations during the due process hearing.  Because "federal courts do not superintend or review state administrative proceedings under the IDEA, . . . any procedural [errors] that may have occurred during those proceedings were not for the district court [or this Court] to review." *Miller*, 64 F.4th at 574.  Alleged procedural errors could affect a federal court's assessment of whether a hearing officer's findings were regularly made or otherwise persuasive, but we harbor no such doubts here.

[14] Notwithstanding that determination, G.M. argues he was denied a FAPE based on these procedural violations.  To support this argument, G.M. relies on the 2004 amendments to the IDEA, which provide, in relevant part:

> In matters alleging a procedural violation, a hearing officer may find that a child did not receive a [FAPE] only if the procedural inadequacies . . . (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child . . . .

20 U.S.C. § 1415(f)(3)(E)(ii).  Our Court has interpreted this clause to require "a procedural violation," that "significantly impeded the parents' opportunity to participate," with the "result" that the "child did not receive a FAPE." *R.F.*, 919 F.3d at 248 (internal

29

relief in the form of a favorable eligibility determination and reimbursement for his Jemicy tuition and other costs. Thus, even if we assumed that these procedural violations occurred and were properly raised below, they would not entitle G.M. to the substantive relief he seeks. In this type of situation, our Court declines to address potential procedural violations. *See T.B., Jr.*, 897 F.3d at 573–574.

III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

quotation marks and brackets omitted). Because G.M. received a FAPE, Section 1415(f)(3)(E)(ii)(II) is inapplicable.

30